In re HYPERION ENTERPRISES,
INC., Debtor.

Arnold L. BLASBALG,
Trustee, Appellant,

v.

Thomas TARRO, Individually and d/b/a
Telesis Financial Services, Appellee.

Civ. A. No. 92–618L.

United States District Court,
D. Rhode Island.

Aug. 10, 1993.

Matthew J. McGowan, Salter, McGowan, Swartz & Holden, Inc., Providence, RI, for appellant.

Robert D. Wieck, MacAdams & Wieck, Providence, RI, for appellee.

### MEMORANDUM AND ORDER

LAGUEUX, Chief Judge.

This matter is now before the Court on appeal from a decision and order entered by the United States Bankruptcy Court for the District of Rhode Island on September 11, 1992, 144 B.R. 228. The Trustee, Arnold L. Blasbalg, appeals the Bankruptcy Court's determination that the alleged debt from the Debtor, Hyperion Enterprises, Inc. ("Hyperion") to Thomas Tarro/Telesis Financial Services ("Tarro") should be neither recharacterized as a contribution to capital nor equitably subordinated, and that Tarro's security interest is not voidable as a preferential transfer.

## I. Background

The facts as found by the Bankruptcy Court are as follows:

Hyperion, a point of purchase display company, was incorporated in 1977, and was primarily owned and operated by one individual, Dezsoe G. Halmi ("Halmi"). In 1978, Tarro was first engaged as legal counsel by Hyperion, and thereafter he and Halmi developed a close business and personal relationship. Over the next several years, Hyperion incurred a sizable debt to Tarro in legal fees.

In September 1986, Hyperion's long-standing regular lender, Peoples Bank, called its line of credit and terminated its lending relationship with Hyperion, threatening the continued operation of the business. When Hyperion sought, but was unable to secure, other traditional sources of financing, it was Tarro who came to the rescue. He agreed to loan $200,000 to Hyperion, some of which was to be used to pay off the Bank. This $200,000 was advanced in two installments, originally evidenced by separate promissory notes concomitant with their being made, but later consolidated into a single note dated March 23, 1987, in the principal amount of $200,000. The March 23, 1987 note was secured by all of Hyperion's assets, and Tarro's security interest was duly perfected on March 25, 1987. Hyperion granted Tarro a second security interest in all of the assets of Hyperion to secure the debt for legal fees, and this lien was also perfected on March 25, 1987.

Following these initial loans, Tarro and Hyperion established an ongoing lender-borrower relationship which continued for the next five years. From 1987 through May, 1988, every loan from Tarro to Hyperion was evidenced by a promissory note and was secured by all of Hyperion's assets. The financing statements for each were properly filed and, thus, the security interests were duly perfected.

In June, 1988, Tarro established his own factoring entity which he called Telesis Financial Services ("Telesis"), for the specific purpose of making operating funds available to Hyperion on a revolving line of credit, based upon purchase orders. At the time Telesis was created, Hyperion was factoring its accounts receivable through Access Capital, Inc. ("Access Capital"), at prohibitive interest rates. Both Tarro and Halmi testified that the reason Telesis was formed was to relieve, at least in part, the economic drain on Hyperion caused by the exorbitant fees being charged by Access Capital. To fund Telesis, Tarro borrowed $200,000 from Bank of New England, and consistent with past practice between Hyperion and Tarro, Telesis' revolving line of credit with Hyperion was secured by all of Hyperion's assets. Under this factoring arrangement, Telesis received a 4% fee on each advance on purchase orders.

In June, 1988, "in appreciation of" Tarro's ongoing financial assistance to the Debtor, Halmi "gave" Tarro 500 shares of Hyperion stock, constituting a 25% interest in the corporation. There was no evidence before the Bankruptcy Court as to the value of the shares transferred to Tarro, but it determined that in hindsight the value was probably zero.

According to Hyperion's audited financial statements as of November 30, 1988, the balances on the various loans between Tarro/Telesis and Hyperion were as follows: $200,642 was due under the Telesis factoring arrangement; $24,000 was due under a $39,000 Note of April 29, 1988; and $40,000 remained due under the March 23, 1987 $200,000 Note. In addition, as of January 20, 1989, Hyperion owed Tarro $26,929.23 for legal services. Numerous additional advances were made during the 1989 and 1990 fiscal years.

In the spring of 1990, Access Capital found itself "out of formula" with Hyperion. As a result, the parties agreed that Telesis would make no further advances to Hyperion and that Hyperion would suspend all interest payments to Tarro/Telesis until Access Capital was brought back into formula. It was anticipated that this would occur by November, 1990. When November, 1990, arrived however, Access Capital announced that it would no longer factor Hyperion's receivables. As a result, in early 1991 Hyperion was required to, and did, find another factor, Concord Growth.

At around this same time, and in order to consolidate all of its indebtedness to Tarro/Telesis, on January 9, 1991, Hyperion executed a new promissory note in the amount of $500,000, which as those before it, was secured by all of Hyperion's assets. Again, a UCC Financing Statement was duly filed with the Rhode Island Secretary of State on February 5, 1991. It is undisputed that no new money was advanced in connection with the January 9, 1991, Note and that it was executed in recognition of an antecedent debt. Tarro testified without contradiction that $500,000 was a compromise figure that was intended to combine all of the outstanding loans, advances, and legal fees, as well as the accrued interest on the principal balances from the Spring of 1990 to November 1990. According to Tarro, the actual amount due exceeded $500,000, but that in the spirit of compromise and to simplify matters, he agreed to this lesser amount, and the Bankruptcy Court accepted those statements.

Subsequently, on May 14, 1991, Tarro advanced an additional $25,000 to Hyperion, as evidenced by a promissory note of the same date.

The November 30, 1990 audited financial statements of Hyperion reflect the $500,-000 debt. As of July 31, 1991, the principal balance due under this Note is alleged to be $461,600, and is the amount presently sought by Tarro as his claim in this bankruptcy case, "together with accrued interest, fees and expenses."

Under Concord Growth's 1991 factoring arrangement with Hyperion, and in accordance with the parties' previous agreement regarding the payment of Access Capital's debt, Concord Growth was to make all Hyperion advances directly to Access Capital until that obligation was fully satisfied. Once Access was paid off, Concord was free to direct its advances to Tarro/Telesis.

However, before the accomplishment of that objective, there was an unexpected event which Hyperion says resulted in its demise. Access Capital, after being paid the full amount it had previously claimed was due from Hyperion, demanded an additional $250,000, and refused to release Concord Growth from making advances to it until the extra money was paid. This action, of course, aggravated Hyperion's cash flow problems, causing it to default in its rent payments and in certain payroll obligations. Faced with this latest dilemma, and having received practically no payments during the entire 1991 calendar year, Tarro panicked. On August 30, 1991, Tarro made demand for immediate possession of all of Hyperion's assets, in accordance with his rights under the January 9, 1991 Note. Upon receipt of this demand, Hyperion voluntarily delivered possession of its assets to Tarro. Shortly thereafter, on September 12, 1991, the Debtor was petitioned into receivership by a creditor, Rhode Island Plastics Co., Inc., and with the permission of the Rhode Island Superior Court the assets of Hyperion were sold at public auction for $200,000. Hyperion then entered Chapter 7 bankruptcy.

The Chapter 7 Trustee objected to Tarro's claim under the January 9, 1991 Note,

and the $200,000 proceeds were held in escrow pending the Bankruptcy Court's disposition of Tarro's proof of claim. After six days of hearing, the Bankruptcy Court decided in favor of Tarro, holding that it would (1) not recharacterize the alleged debt as a contribution to capital; (2) not equitably subordinate Tarro's claim; (3) not avoid the January 9, 1991 note and security interest as a preferential transfer; and (4) not avoid that transaction as a fraudulent conveyance. *Blasbalg v. Tarro (In re Hyperion Enterprises)*, 144 B.R. 228 (Bankr. D.R.I.1992) ("Bankruptcy Opinion"). The Trustee appealed that decision to this Court pursuant to 28 U.S.C. § 158(a). A hearing was held on February 26, 1993, and the matter was taken under advisement. It is now in order for decision.

## II. Discussion

The Trustee has raised three principal issues in this appeal.

(1) Whether the Bankruptcy Court erred in holding that the alleged debt from Hyperion to Tarro/Telesis should not be recharacterized as a contribution to the capital of Hyperion?

(2) Whether the Bankruptcy Court erred in holding that the alleged debt should not be subordinated to the claims of other creditors of Hyperion?

(3) Whether the Bankruptcy Court erred in holding that Hyperion's granting of a security interest to Tarro on January 9, 1991 was not a preferential transfer?

Since this matter is before the Court on appeal of the Bankruptcy Court's decision, it must accept the findings of fact made by the bankruptcy judge unless they are clearly erroneous. Fed.R.Bankr.P. 8013. Conclusions of law, however, are reviewed by the district court de novo.

## A. Recharacterization and Equitable Subordination

■ The Trustee first presents two related arguments: first, that the alleged debt to Tarro should have been recharacterized as a contribution to capital, and second, that if not so recharacterized, Tarro's claim

should have been subordinated to the claims of the unsecured creditors. The Trustee did not address these arguments separately in his complaint before the Bankruptcy Court, but he now agrees that said Court properly treated them as distinct issues. However, the Trustee's argument to this Court continues to confuse the standards under these two doctrines. The source of this confusion is apparent. The recharacterization of loans as contributions to capital was traditionally considered as a subset of a bankruptcy court's equitable subordination powers. Recent cases from the Fifth Circuit continue to treat it as such. However, this Court agrees with the Bankruptcy Court that the doctrines serve different purposes and should be addressed separately.

Equitable subordination has long been recognized as a power of a bankruptcy court to act as a court of equity. In 1939 the Supreme Court explored the contours of that power in the case of *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). In that case the Court subordinated a judgment for so-called salary claims by a shareholder. The Supreme Court stated,

> In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate.... [Claims] have been disallowed or subordinated where the courts have been satisfied that allowance of the claims would not be fair or equitable to other creditors.

308 U.S. at 307–09, 60 S.Ct. at 245–46. The Court enumerated circumstances where that result was appropriate, including where the claims are

> salary claims of officers, directors, and stockholders in ... "one-man" or family corporations...., where the claim asserted is void or voidable because the vote of the interested director or stockholder helped bring it into being or where the history of the corporation shows dominancy and exploitation on the part of the claimant. It is also reached where on the

facts the bankrupt has been used merely as a corporate pocket of the dominant stockholder, who, with disregard of the substance or form of corporate management, has treated its affairs as his own. And *so-called loans or advances by the dominant or controlling stockholder will be subordinated to claims of other creditors and thus treated in effect as capital contributions* by the stockholder not only in the foregoing types of situations but also where the paid-in capital is purely nominal, the capital necessary for the scope and magnitude of the operations of the company being furnished by the stockholder as a loan."

308 U.S. at 308–10, 60 S.Ct. at 246 (emphasis added). In that case, the type of recharacterization being urged by the Trustee was recognized as a form of equitable subordination.

■ The prevailing standard for equitable subordination of claims is that pronounced by the Fifth Circuit in the case of *In re Mobile Steel Co.,* 563 F.2d 692, 699–700 (5th Cir.1977):

(1) The claimants must have engaged in some type of inequitable conduct.

(2) The misconduct must have resulted in injury to creditors or conferred an unfair advantage on the claimant.

(3) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.

These elements have been recently reaffirmed by the First Circuit in *In re Giorgio,* 862 F.2d 933 (1st Cir.1988), and are almost universally cited.[1]

The boundaries of inequitable conduct under the first part of this test are not precisely defined. Courts have recognized three categories of misconduct which may constitute inequitable conduct: "(1) fraud, illegality, and breach of fiduciary duties;

(2) *undercapitalization;* or (3) claimant's use of the debtor as a mere instrumentality or alter ego." *In re Fabricators, Inc.,* 926 F.2d 1458, 1467 (5th Cir.1991) (citing *In re Missionary Baptist Foundation, Inc.,* 712 F.2d 206, 212 (5th Cir.1983) (*Missionary Baptist I*)) (emphasis added).[2] The Trustee here is relying on Hyperion's undercapitalization as demonstrating inequitable conduct.

In using undercapitalization as a form of inequitable conduct, the Fifth Circuit has treated equitable subordination as interchangeable with the recharacterization of loans as equity contributions. In *Mobile Steel,* the Fifth Circuit recognized that initial undercapitalization could be a form of inequitable conduct, which could justify treating claims "as if they were based upon contributions to capital rather than loans." 563 F.2d at 702. Again in *Fabricators,* the Court used the doctrine of equitable subordination to recast loans from an insider as contributions to capital. However, in that case the Court stated that "while undercapitalization alone is an insufficient reason to use equitable subordination, evidence of other inequitable conduct may justify subordination." *Id.* at 1469.

■ This Court agrees with the Bankruptcy Court that the issues of recharacterization of debt as equity capital and equitable subordination should be treated separately. Undercapitalization may play a role in a determination of inequitable conduct, because it is "often a bed fellow of other insider misconduct." *In re Multiponics, Inc.,* 622 F.2d 709 (5th Cir.1980). For example, in the *Daugherty Coal* case cited by the Trustee, the creditor not only advanced funds when the debtor was unable to obtain other financing, but also obtained security at a late date and without going through appropriate formalities, in effect leap-frogging over the other creditors. *In*

---

1. The third element is arguably moot given the 1978 enactment of the Bankruptcy Code equitable subordination provision, 11 U.S.C. § 510(c). *Diasonics, Inc. v. Ingalls,* 121 B.R. 626 (Bankr. N.D.Fla.1990).

2. Both the Seventh and Eighth Circuits have recently shed doubt on the necessity of this first

element, holding that inequitable conduct is not always required in upholding subordination of claims by the I.R.S. for tax penalties. *Joiner v. Henman,* 902 F.2d 1251 (7th Cir.1990); *Schultz Broadway Inn v. United States,* 912 F.2d 230 (8th Cir.1990).

*re Daugherty Coal Co.*, 144 B.R. 320 (N.D.W.Va.1992). In such a case equitable subordination "permits a bankruptcy court to take account of misconduct of one creditor towards another" to "subordinate those debts, the creation of which was inequitable *vis-a-vis other creditors.*" *In re Giorgio*, 862 F.2d at 939 (emphasis in original). On the other hand, where shareholders have substituted debt for adequate risk capital, their claims are appropriately recast as equity regardless of satisfaction of the other requirements of equitable subordination. *See Diasonics, Inc. v. Ingalls*, 121 B.R. 626, 630 (Bankr.N.D.Fla.1990). Such an approach also allows for consistency with other areas of law where determinations of status as debt or equity are important, such as under the tax code.

■ The statutory language of the Bankruptcy Code equitable subordination provision supports this interpretation. That section provides:

Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest;

(2) order that a lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). In providing that claims may be subordinated to claims and interests to interests, section 510(c) does not authorize recasting of a claim as an interest. However, section 510(c) does not prevent a court from viewing the substance of a transaction over its form, and determining that a claimant in fact took an equity position. *Collier on Bankruptcy*, § 510.05[1] at 510–8 (15th ed. 1993).

### 1. Recharacterization

■ In considering the recharacterization of the alleged loans by Tarro, the Bankruptcy Court used the criteria it endorsed in *In re Labelle Industries, Inc.*, 44 B.R. 760 (Bankr.D.R.I.1984), adopted from the Rhode Island Supreme Court case of *Tanzi v. Fiberglass Swimming Pools, Inc.*, 414 A.2d 484 (R.I.1980). In considering the treatment of a disputed insider transaction,[3] the Court considered numerous factors, including:

(1) the adequacy of capital contributions; (2) the ratio of shareholder loans to capital; (3) the amount or degree of shareholder control; (4) the availability of similar loans from outside lenders; and (5) certain relevant questions, such as (a) whether the ultimate financial failure was caused by under-capitalization; (b) whether the note included payment provisions and a fixed maturity date; (c) whether a note or other debt document was executed; (d) whether advances were used to acquire capital assets; and (e) how the debt was treated in the business records.

Bankruptcy Opinion at 17. Applying these criteria to the instant claim, the Bankruptcy Court found that the transactions were genuine loans.

The Trustee is decidedly unclear about what error, either of fact or of law, he is alleging in the Bankruptcy Court's determination on this issue. He appears to raise four issues.

First, there appears to be some contention that the Bankruptcy Court applied an incorrect legal standard. The Trustee cites the *Tanzi* decision and admits those factors are also considered by other courts, but goes on to argue that undercapitalization is the crucial point, stating that "under the 'Deep Rock' doctrine 'a shareholder's advances to his company will be treated as capital contributions when under the equities a company is deemed undercapitalized.' " (citing *In re Multiponics*, 622 F.2d at 717). To the extent that the Trustee is contending that an incorrect legal standard was applied and that mere undercapitalization justifies recharacterization of this debt, the Court rejects that argument. The

---

**3.** For the purposes of this analysis, the Bankruptcy Court assumed that Tarro was an insider, despite the court's factual finding that Tarro was *not* an insider.

multi-factor approach used by the Bankruptcy Court is in accord with the approach used in other circuits, particularly in determinations under the Tax Code. *See, e.g., Montclair, Inc. v. Commissioner,* 318 F.2d 38 (5th Cir.1963) (acknowledging at least eleven separate factors used by courts to determine whether amounts advanced to a corporation constituted equity capital or indebtedness).

■ Second, the Trustee argues that the Bankruptcy Court erred in applying a subjective test to the issue of whether there was a reasonable expectation of payment. This is a mischaracterization of the Bankruptcy Court's decision. After careful consideration of the many objective factors leading to its decision that the disputed transactions were indeed loans, the Bankruptcy Court added, "We specifically reject the Trustee's contention that Tarro's intention was to risk his capital upon the success of the venture. There is no evidence that Tarro expected that the payment of these obligations was contingent upon Hyperion's ultimate success...." Bankruptcy Opinion at 18. This was not the basis for the Bankruptcy Court's decision but a response to the Trustee's argument. There is no error in this regard.

■ The Trustee's third argument is that the Bankruptcy Court erred in considering Hyperion's factors, Access Capital and later Concord Growth, as outside lenders for the purpose of considering Hyperion's undercapitalization. Again, the Trustee mischaracterizes the Bankruptcy Court's decision. The Court did not use the availability of funds from these factors to determine that Hyperion was not in fact undercapitalized, under the "informed outside lender" test cited by the Trustee. Rather, the Court simply noted that similar financing arrangements to that being provided by Tarro were available from the factors, as suggested by *Tanzi*'s consideration of "the availability of similar loans from outside lenders."

■ The Trustee finally offers an analysis of a number of "other relevant factors" which he claims should lead to a recharacterization of these transactions. Again, it is unclear what error the Trustee is alleging in the Bankruptcy Court's determination. The Bankruptcy Court applied the correct legal standard in determining that the transactions in question were in economic reality loans, and the Trustee has not pointed to any clear error in that factual determination. The Bankruptcy Court's decision on this issue must therefore be affirmed.

### 2. Equitable Subordination

The Trustee next argues that the alleged debt to Tarro, if not recharacterized as a contribution to capital, should be equitably subordinated to the claims of the other creditors.

As discussed above, the First Circuit has adopted the Fifth Circuit's formulation of the elements necessary to subordinate a claim. The Trustee must show:

(1) The claimants must have engaged in some type of inequitable conduct.

(2) The misconduct must have resulted in injury to creditors or conferred an unfair advantage on the claimant.

(3) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.

*In re Giorgio,* 862 F.2d at 938–39 (quoting *Mobile Steel*).

In the instant case, the Bankruptcy Court cited the above standard and stated that "the Trustee's request for equitable subordination must be denied" because there is "no evidence ... how if at all Tarro's conduct might have been unfair to [other creditors]." The Bankruptcy Court found "no evidence ... to even suggest that the loans by Tarro/Telesis were unfair to other creditors, or that any special inequity resulted from such loans vis-a-vis other creditors."

The Trustee's argument is two tiered. First, he argues that the Bankruptcy Court made several legal and factual errors in concluding that Tarro was not an "insider" within the meaning of the Bankruptcy Code, 11 U.S.C. § 101(31). That error in turn, he argues, led the Court to apply the

wrong legal standard for invoking equitable subordination. Unlike under its recharacterization analysis, where the Bankruptcy Court specifically considered the issue under an insider standard, the Trustee argues that the Bankruptcy Court applied the non-insider test, which requires that the "conduct was egregious and severely unfair to other creditors" rather than the insider standard, requiring only unfairness. Because the Court finds that the Bankruptcy Court's factual finding that there was no unfairness satisfies even the less rigorous insider standard, affirmance of the Bankruptcy Court's determination is justified.

### a. Insider Standard

 A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts. *In re Fabricators*, 926 F.2d at 1465. However, the mere fact of an insider relationship is insufficient to warrant subordination. *Id.* at 1467. "The reason that transactions of insiders will be closely studied is because such parties usually have greater opportunities for such inequitable conduct, not because the relationship itself is somehow a ground for subordination." *Id.* at 1465 (quoting *In re Missionary Baptist Foundation, Inc.*, 818 F.2d 1135, 1144, n. 8 (5th Cir.1987) (*Missionary Baptist II*)). Such claims are not automatically subordinated because insiders are the persons most interested in restoring and reviving the debtor, and such bona fide efforts should be viewed with approval. *See* 3 Collier in Bankruptcy, ¶ 510.05[3a] at 510–14.

 Insider status goes only to determining the standard under which the creditor's conduct is reviewed. Where a creditor is a non-insider, the trustee must show that the creditor's conduct was "egregious and severely unfair in relation to other creditors." *In re Giorgio*, 862 F.2d at 939. In the context of insiders, the standard is one of simple unfairness. Furthermore, the burden of proof shifts in insider transactions. Once the trustee has met his initial burden of going forward with factual evidence to overcome the va-

lidity of the claimant's proof of claim, the burden shifts to the claimant/insider to demonstrate its good faith and the fairness of its conduct. *Fabricators*, 926 F.2d at 1465. In order to shift the burden, the Trustee must provide a "substantial factual basis to support its allegation of impropriety." *Mobile Steel*, 563 F.2d at 701.

### b. Inequitable Conduct

 The Bankruptcy Court refused to equitably subordinate Tarro's claim because it found that there was no evidence of inequity in Tarro's conduct. Because the Trustee failed to present any evidence of impropriety, equitable subordination was not appropriate.

The Trustee appeals this determination with an elaborate discussion of the facts supporting his contention that Hyperion was undercapitalized. However, it is clear to this Court that the Bankruptcy Court did not make a factual finding that Hyperion was sufficiently capitalized. Rather, the Bankruptcy Court determined that all the evidence, including that of Hyperion's undercapitalization, did not show that Tarro's conduct was unfair to other creditors.

In essence, the Trustee's argument appears to be that the Bankruptcy Court's failure to find inequitable conduct simply because of the debtor's undercapitalization was clear error. That is not the case. A finding of inequitable conduct requires more than a showing of undercapitalization. There must be evidence of other inequitable conduct. *Fabricators*, 926 F.2d at 1469. The Trustee has not shown clear error in the Bankruptcy Court's factual finding that Tarro's conduct was not unfair to the other creditors. Therefore, the Court's decision on this issue must be affirmed.

### B. Preferential Transfer

 The Trustee's last argument is that the Bankruptcy Court erred in holding that the granting of a security interest, perfected on February 5, 1991, was not a

preferential transfer under 11 U.S.C. § 547(b).

Section 547(b) provides:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor-

(1) to or for the benefit of a creditor;

(2) on or account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

The Bankruptcy Court held that there was no preferential transfer here because the January 9, 1991 Note and Security Agreement did *not* enable Tarro to receive more than he would have received under chapter 7 had the transfer not taken place. The Bankruptcy Court found that Tarro first obtained his security interest in 1987, and preserved it through January 9, 1991. As of that date, Tarro was already a secured creditor in all of Hyperion's assets. Had the January 9, 1991 consolidation loan never taken place, Tarro would still have a valid security interest in all of Hyperion's assets.

The Trustee argues that the Bankruptcy Court failed to consider his point. He does not contend that the January 9, 1991 Note and Security Agreement in itself was a preferential transfer; rather it was the February 5, 1991 UCC filing regarding that security inteest that constituted the preferential transfer.

The Trustee's argument has two parts. First, he argues that the consolidation note of January 9, 1991, encompassing all the previous notes, was intended to extinguish the prior obligations and constituted a novation. Therefore, the Trustee argues, the financing statements on file securing those previous debts were vitiated and of no effect as of January 9, 1991, since they evidenced a security interest that had been extinguished.

Second, the Trustee notes that the new January 9, 1991 financing statement was not filed with the Rhode Island Secretary of State until February 5, 1991. 11 U.S.C. § 547(e)(2) provides:

For the purposes of this section, except as provided in paragraph (3) of this subsection, a transfer is made—

(A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 10 days after, such time;

(B) at the time such transfer is perfected, if such transfer is perfected after such 10 days; ...

The Trustee argues that because the statement was not perfected until 27 days after the Note and Security Agreement was signed, the new security interest was not granted until February 5, 1991. The previous security agreements having been released by the January 9, 1991 novation, a "gap" was created for that 27 day period, during which, according to the Trustee, the obligation was unsecured. When that obligation again became secured on February 5, 1991, the Trustee argues, there was a transfer that allowed Tarro to receive more than he would have if that transfer had not been made.

Before addressing the Bankruptcy Court's treatment of the Trustee's argument, the Court first notes that the Trustee

appears to be confusing the issue of the existence of a security interest with that of perfection of that interest. The Trustee's contention that there was a period in which this debt was unsecured is clearly without merit. Even assuming that the January 9, 1991 consolidation did in fact release all prior security interests, it at the same time established a security interest on the same assets of Hyperion. There was no point in time at which the debt to Tarro was unsecured.

 The real question raised by the Trustee is whether there was a lapse in the perfection of Tarro's security interest. Under section 547, the reperfection of a continuing security interest, the perfection of which has been allowed to lapse, can constitute a preferential transfer. *In re Karisda, Inc.*, 90 B.R. 196 (Bankr.D.S.C.1988) (lapse in perfection due to expiration of financing statement without filing of continuation statement; filing of second financing statement within 90 days before bankruptcy filing constituted preferential transfer).

The Bankruptcy Court rejected the Trustee's argument, stating that his contention that the January 9, 1991 Note and Security Agreement was a novation was "so devoid of merit and supporting authority, that it deserves and will receive no further comment." The Trustee argues that this finding was clear error because of Tarro's admission in his answer of paragraph 19 of the complaint, which states:

> On January 9, 1991 all of the various alleged obligations of the Debtor to Tarro were intended by the parties to be, and in fact, were, encompassed in one promissory note in the principal amount of $500,00.... Through that action, the parties *intended to and in fact did, extinguish all alleged obligations of the debtor to Tarro evidence by earlier dated notes or otherwise.*

This Court need not address the alleged error by the Bankruptcy Court on this point, because the Court agrees with Tarro that regardless of the characterization of the January 9, 1991 transaction, Tarro's security interest was at all times perfected because of the previously filed financing statements.

On January 9, 1991, a UCC 1 Financing Statement asserting a security interest in all of Hyperion's assets in favor of Tarro was on file. That statement was filed on January 23, 1989, at the time that a previous note by Hyperion was executed. That financing statement was sufficient to perfect the security interest at issue here. The Uniform Commercial Code, as adopted by the State of Rhode Island, specifically authorizes that a "financing statement may be filed before a security interest is made." R.I.G.L. § 6A–9–402 (1985).

The fact that the financing statement at issue here was originally filed in connection with another security agreement is of no importance. The Official Comment to UCC Section 9–402 notes that the filing system is set up so that a single filing can cover a continuously changing arrangement of collateral. It states, "even in the case of filings that do not necessarily involve a series of transactions the financing statement is effective to encompass transactions under a security agreement not in existence and not contemplated at the time the notice was filed...." Official Comment 2 to U.C.C. § 9–402 (R.I.G.L. § 6A–9–402). Those later interests are perfected "even if the filing of the advances ... contemplated [at time of filing] have been fully paid in the interim." *In re Nason*, 13 B.R. 984 (Bankr.D.R.I.1981) (quoting The Review Committee for Article 9, Final Report, 226–27 (1971)).

This result is consistent with the "notice filing" nature of Article 9. The financing statement is not required to indicate the amounts secured or include the security agreement itself. "The notice itself indicates merely that the secured party who has filed may have a security interest in the collateral described. Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs." Official Comment 2 to U.C.C. § 9–402.

 This result is also consistent with the policy of section 547(b). The pref-

erence provision of section 547 is designed to deter creditors from racing to dismember the debtor prior to a bankruptcy filing, and to ensure an equitable distribution of assets among members of the same class by preventing a debtor from favoring some among them. *See In re Lumpkins,* 12 B.R. 44 (Bankr.D.R.I.1981). The strict perfection requirements serve that purpose by preventing a creditor from hiding his secured position until immediately before the bankruptcy filing. In this case, all creditors had notice of Tarro's prior secured position for years prior to this restructuring. Tarro did not improve his position in any way through this transaction, and therefore an avoidable transfer under § 547(b) did not occur. In short, Tarro's security interest was valid and perfected at all times, from his initial filing in 1987 through Hyperion's bankruptcy in 1991. Consequently, the Bankruptcy Court's determination on this issue must be affirmed.

III. Conclusion

For the reasons given above, the decision and order of the Bankruptcy Court dated September 11, 1992, is hereby affirmed. The Clerk shall enter an appropriate judgment forthwith.

It is so ordered.