DECISION
In this receivership action, D'Angelo Custom Homes, LLC and D. Larsen and Sons LLC seek to subordinate the debt of the mortgage holder, Wells Fargo Bank, N.A. in order to give their debts priority.
 I. Findings of Fact
In early 2008, D'Angelo Custom Homes, LLC ("D'Angelo") entered into an agreement with WREC Precision Park, Inc. ("WREC") to perform construction work on a commercial property. Specifically, D'Angelo agreed to complete `build-outs' on parcels owned by WREC, so the properties would be prepared for new commercial tenants. After a build-out for Big Fitness, Inc. was completed, D'Angelo was contracted by WREC to do the build-out for Frito Lay, Inc. No written contracts were placed into evidence.
The initial payments due to D'Angelo were paid timely. By September 20, 2008, D'Angelo had received about $229,300 for the Frito Lay project. In order to procure the *Page 2 
payments, D'Angelo routinely executed lien waivers in advance. Exhibit 8 is an acknowledgement that a payment of $92,775, and cumulative payments of over $322,075, had been received. The document was signed under oath on September 19, 2008, when D'Angelo had not received the payments described. Through the next month, D'Angelo performed an additional $54,900 in work, with a balance of $104,775 remaining due.[1] D'Angelo, behind in its monies due and not receiving payments, ceased work in October 2008.
Larsen was enlisted by WREC to perform heating, ventilation and air-conditioning work on the Frito Lay build-out. Larsen invoiced $44,542 for work on the building and is currently due $42,906.83. After several attempts at collection, Larsen ceased work in October 2008 and told WREC he would require payment before returning.
When the contractors stopped working, the Frito Lay project was nearing completion. Frito Lay expected to occupy the premises in November 2008, but no Certificate of Occupancy was issued from the town. At some point, [2] Mr. D'Angelo was attempting to procure continued payments and met at the site with Bernard Wasserman, a principal of WREC. Mr. D'Angelo sought assurance that he would be paid for the remaining work. Mr. Wasserman indicated he was calling a banker on his cell phone. In front of Mr. D'Angelo he had a brief conversation and then placed his cell phone on speaker. Mr. D'Angelo, believing he was speaking to a bank representative, was told that he would receive full payment if he completed the work. At some point, Mr. Wasserman *Page 3 
spoke with Mr. Larsen, indicating that the bank had assured payments. When Mr. D'Angelo assured Mr. Larsen that he had received assurances of payment from the bank, Larsen completed its work. Larsen never spoke to the bank.
D'Angelo also completed its work. A Certificate of Occupancy was issued on November 17, 2008.
In October 2008, WREC was also significantly deficient in paying its mortgage. Wells Fargo Bank, the lender, transferred the file to Orix Capital Markets for asset management of the deficient debt. James Lingle, an asset manager for Orix, received the file material on October 31, 2008. He did not confer with Mr. D'Angelo or any representatives of D'Angelo or Larsen before November 15, 2008, when he first visited the site. By then D'Angelo and Larsen had nearly completed their work.
Neither D'Angelo nor Larsen received additional payments. D'Angelo filed a Notice of Intent to enforce a mechanics' lien on November 25, 2008 (for $104,300) and Larsen filed a similar notice on December 8 (for $42,400).
On December 24, 2008, this Court appointed a temporary receiver and stayed further collection proceedings against WREC. Although D'Angelo and Larsen received notice of the receivership, they failed to notify the receivership of the lien (or conform to the requirements of the stay).
 II. Presentation of Witnesses
While Mr. D'Angelo was well-prepared, his recollection of the precise events was not firm, and initially he was very tentative in identifying Mr. Lingle as the person on the cell phone. Of course, Mr. D'Angelo had not spoken with Mr. Lingle previously. Mr. D'Angelo was courteous, pleasant and patient, but he was not confident of his answers, *Page 4 
often looking at his counsel while answering questions on cross-examination, as if he were seeking verification that the responses were appropriate. Mr. D'Angelo appeared educated, sophisticated with the building trade, and intelligent. Oddly, he testified that he made no notes of the conversations for the Frito Lay build-out project, even though he was already seeking $104,775 when he stopped work, and he then agreed to perform more work. This testimony was contrary to his deposition testimony wherein he indicated he had a notebook but discarded it in frustration before filing a claim (Deposition transcript, July 22, 2010, p. 101). The D'Angelo paperwork on several important points was lacking. He produced no independent invoices, billing notes or file material. The paperwork which was produced diminished his credibility: Mr. D'Angelo executed lien releases acknowledging receipt of monies he had not received.
While Mr. D'Angelo produced uncontroverted proof (his own testimony) that Mr. Wasserman made the cell phone call, the Court cannot conclude that Mr. Lingle was on the call. Mr. D'Angelo was not confident that the caller identified himself as Mr. Lingle. Although cell phone records were produced, he never produced cell phone records from Mr. Wasserman for the call.
The Court is also unable to conclude when the cell phone call took place. The date is critical, as Mr. Lingle was very specific about when he received the file material and the date of his call. The date is critical in determining which work of D'Angelo may be entitled to priority. Nevertheless, Mr. D'Angelo was very vague about the date of the crucial call. On direct examination he testified:
 Q. All right. And where did that conference call take place?
 A. He asked me to meet him at the job site. So we met at the job site, and Mr. Wasserman called the bank at that time. *Page 5 
 Q. All right. And were you — when did that phone conversation take place?
 A. From the best of my recollection, the last week of October.
On Cross-examination Mr. D'Angelo testified that the call was in late October (Tr. at 62). Later on cross, Mr. D'Angelo's testimony confirmed the October date:
 Q. Your recollection of that phone conference today, sir, was that it occurred in the last week of October 2008?
 A. Correct, Yes.
 Q. You were able to specify a specific date, sir?
 A. No.
 . . .
 Q. Did you memorialize it in any way?
 A. No, I did not.
 Q. It's an important conversation, wasn't it, sir?
 A. At the time, yes, it was. Trial transcript, p. 67.
 Q. Is it fair to say, sir, on July 22, 2008, when you gave the deposition in this matter, you thought that you talked to Mr. Lingle in the first two weeks of October, 2008?
 A. Yes. At that time that was my best recollection. Transcript, p. 75.
During his deposition of July, 2010, Mr. D'Angelo testified that he spoke to Mr. Lingle "probably two weeks before October 15" (D'Angelo depo., p. 105).[3] The date of the alleged telephone call grew later after Mr. Lingle revealed that he did not receive the file until October 31.[4] Mr. D'Angelo did not meet his burden of proof on the date of the call, or whether Mr. Lingle made the call.
Mr. Larsen, a principal officer of D. Larsen and Sons LLC, was also well prepared. He was clear, professional and pleasant. Concerned with being accurate *Page 6 
throughout, Mr. Larsen was initially uncertain if he had received the telephone calls assuring payment in October or November 2008. While it was his tentative recollection that he telephoned Mr. D'Angelo after speaking with Mr. Wasserman, his telephone records indicate a variety of telephone calls with Mr. D'Angelo and Mr. Wasserman. While it is more likely than not that Mr. Larsen received the telephone calls assuring payment on November 3, 2008, the Court cannot conclude that Mr. Lingle made assurances of payment to Mr. Larsen, or to anyone else, at any time. Mr. Larsen never spoke with Mr. Lingle directly.
James Lingle, the asset manager for the bank, also testified. The Court found Mr. Lingle to be prepared, cooperative, respectful, responsive, professional and thorough. He described the recordkeeping of the firm, which performs asset management for non-performing accounts. He maintains both a document tracking system and a telephone log. Mr. Lingle credibly testified that he never spoke with Mr. D'Angelo at or prior to his on site inspection of the property on November 15, 2008. His records revealed no telephone calls to Mr. Wasserman (or the claimants) in October 2008, and the document history indicates that he was receiving and acquainting himself with the loan on October 31. Further, he credibly revealed how illogical it would have been to authorize direct payment to the creditors: 1.) He was just familiarizing himself with the loan package; 2.) He was not familiar with whether their work would add value to the property at that early point; 3.) He was not yet familiar with the arrangement with Frito Lay; 4.) The loan was in significant default; 5.) He was not yet aware of what work D'Angelo or Larsen had done, and if any direct payments were previously made; and 5.) The debtor may not be acknowledging or agreeing to the debt, particularly if the payments were made *Page 7 
directly, without any corfirmatory writing. In essence, more paperwork and a site inspection was required. On cross-examination he did acknowledge that he spoke with Mr. D'Angelo after November 18 (Tr. at 125).
Attorney Peter Furness also testified. As the court-appointed receiver in this action, he acknowledged that he arranged for Mr. D'Angelo to perform certain post-petition work after the receivership was created in late December. He agreed to have the work done to satisfy Frito Lay, the new tenant. D'Angelo has been paid for this post-petition work.
 III. Travel of the Case
As indicated, the financing company instituted this receivership case in December of 2008 and Attorney Furness was appointed the receiver. D'Angelo and Larsen filed proofs of claim. The Receiver filed a Motion for Allowance of Secured Claims, which the court approved in August 2009, without objection from either D'Angelo or Larsen. The Court found Wells Fargo to have a first priority claim of $24,526,065.04.
In November 2009, the Receiver petitioned the Court for permission to sell the real estate. D'Angelo and Larsen then objected, claiming they had a priority interest. The Court ordered that the real estate may be sold, but $188,700 would be segregated by the receiver pending resolution of the D'Angelo and Larsen claims. (Order of December 2009).
As the obligations of the receivership depended on facts at issue, the Court conducted an evidentiary hearing on February 25 and 28, 2011. *Page 8 
 IV. Analysis A. The Facts Provide Insufficient Support to theCreditor's Claims
In their memorandum, D'Angelo and Larsen pose a limited description of the testimony presented at the hearing. Their entire argument depends upon their reasonable reliance on assurances purportedly made during one telephone conversation. The conversation was between Mr. D'Angelo, Mr. Lingle and Mr. Wasserman on a cell phone. Mr. Lingle denies the substance of the call, and states that any conversation with Mr. D'Angelo was well after the completion of the work. Mr. D'Angelo was not clear about the date, and has changed his testimony about when the conversation occurred. He was not certain who he was speaking to. Oddly, Mr. Wasserman was never called as a witness. Cell phone records of the key telephone conversation were never presented. Though several other witnesses were in the area when the speaker was activated on the call, they were not presented. Mr. D'Angelo did not present any paperwork verifying the arrangement. There was no contract, no confirmatory letter, no revised bill, and no notes of the call.[5]
Mr. Larsen depended completely on conversations that he had with Mr. D'Angelo and Mr. Wasserman. While the Court does not question Mr. Larsen's credibility, his theory of recovery is completely dependent upon Mr. D'Angelo's alleged telephone conversation with the bank's representative.
Mr. D'Angelo's proof of the conversation is limited to his own testimony, which conflicted with his prior testimony. Mr. D'Angelo's testimony was disputed by the *Page 9 
credible evidence of Mr. Lingle, (applying a mere preponderance of evidence) hence, there is insufficient proof to justify the requests to heighten the priority of the two claims.
B. The Principals of Equitable Subordination do notApply
The claimants contend their debts should have priority over the debts of the bank, based upon the theory of equitable subordination. Mr. Justice Silverstein of this Court addressed the standard to be applied:
 It is well-settled that in order to establish a claim for equitable subordination, a party must prove the following three elements: (1) "[t]he claimants must have engaged in some type of inequitable conduct; (2) [t]he misconduct must have resulted in injury to creditors or conferred an unfair advantage on the claimant and (3) [e]quitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." In re Hyperion Enterprises. 158 B.R. 555, 560 (D.R.I. 1993).
 Inequitable conduct, as required by the first prong of the test for equitable subordination, includes "(1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego." Id. Where a creditor does not consist of an insider, however, the conduct must be "egregious and severely unfair in relation to other creditors." In re Giorgio, 862 F.2d 933, 939 (1st Cir. 1988).
 To meet the second prong of the test, "the proponent of equitable subordination need only allege `that general creditors are less likely to collect their debts' as a result of the allegedly inequitable conduct." In re KDI Holdings, Inc., 277 B.R. 493, 509 (Bankr. S.D.N.Y. 1999). Finally, the third element of the equitable subordination test "recognizes that the doctrine is not a mechanism to be used by courts to alter the statutory scheme in an effort to reach a result the court considers more equitable than the distribution scheme provided for in the Bankruptcy Code." In re Sunbeam Corp., 284 B.R. 355, 364 (Bankr. S.D.N.Y. 2002). In general, whether a factual situation merits the application of the doctrine of equitable subordination presents a question of law. In re United States Abatement *Page 10 Corp., 39 F.3d 556, 559 (5th Cir. 1994); In re Clark Pipe Supply Co., 893 F.2d 693, 700 (5th Cir. 1990).
 HNY Holding Co., Inc. v. Danis Transportation Company, Inc. 2004 WL 2075158, 6 (R.I. Super.) (R.I. Super., 2004)
Therefore, in order to subordinate the claim of Wells Fargo, D'Angelo and Larsen must establish: (1) Wells Fargo engaged in inequitable conduct; (2) the misconduct harmed the creditors or conferred an unfair advantage on Wells Fargo, and (3) subordination of the Wells Fargo claim is consistent with the Bankruptcy Code. D'Angelo and Larsen have not briefed these issues and instead have placed their reliance on various equity maxims.
As set forth above, the claimants failed to establish that Wells Fargo or Mr. Lingle engaged in inequitable conduct. As there was no misconduct, then the conduct did not confer an unfair advantage. Certainly, there was no fraud, illegality or breach of fiduciary duty. Presumably, D'Angelo and Larsen remain creditors of the receivership, to the extent of their claims. As Wells Fargo was the entity which pressed to liquidate the assets of WREC, and the receivership paid D'Angelo and Larsen for post-petition work, the only harm to D'Angelo and Larsen was the subordination of their pre-petition claims for work done after the purported telephone call and before the receivership. According to Mr. D'Angelo, all of that work was done with the knowledge that Wells Fargo provided the underlying financing for the property.
Further, equitable rights are applicable only where the law does not provide a clear remedy. See Dan B. Dobbs, Remedies, 1973, p. 27, and Cullen v. Tariani, ___ 3d ___,2011 W.L. 773283 (R.I., March 11, 2011) (injunctions in equity are limited to where there is no adequate remedy at law.) D'Angelo and Larsen were statutorily entitled to *Page 11 
mechanics' liens for the value of their work. They did not perfect those liens. They failed to notify the Receivership of their mechanics' lien petitions. They even failed to object to the receiver's request to prioritize the claims. In August of 2009, the Court found Wells Fargo's claim to be superior to that of D'Angelo or Larsen, and the claimants took no affirmative acts to change this ruling for three months. Hence, it would be unjust to provide them with the benefits of equity, when they failed to preserve their original rights and remedies.
Nor can the Court give priority to the claims of D'Angelo and Larsen simply because they "operate small businesses." (Claimant's post-hearing memorandum at page 14.) This case is not about the size of the parties, or the integrity of large corporations.[6]
Finally, D'Angelo and Larsen have failed to establish how the subordination of the interest of Wells Fargo would be consistent with either the Bankruptcy Code, or state receivership law.
C. The Law of the Case Bars the Claimants FromRecovery
The Court previously decided the priorities of the respective debts in a hearing on August 21, 2009 and an Order of October 2009. D'Angelo and Larsen failed to object, and the order entered establishing the debt of Wells Fargo as senior to that of the claimant.
 Under the law-of-the-case doctrine, after a "judge has decided an interlocutory matter in a pending suit, a second judge on that same court, when confronted at a later stage of the suit with the same question in the identical manner, *Page 12 
should refrain from disturbing the first ruling." Richardson v. Smith, 691 A.2d 543, 546 (R.I. 1997) (citing Salvadore v. Major Electric Supply, Inc., 469 A.2d 353, 355-56 (R.I. 1983)) (emphasis added). This doctrine ensures the stability of decisions and avoids contests between judges that could cause a loss of public confidence in the judiciary. Payne v. Superior Court for Providence County, 78 R.I. 177, 184-85, 80 A.2d 159, 163 (1951). We have declined to apply the doctrine where the "issue did not present itself to the second judge in the same manner in which the first judge examined the issue." Buonanno v. Colmar Belting Co., 736 A.2d 86, 87 (R.I. 1999) (mem.). State v. Graham 941 A.2d 848, 856 (R.I. 2008).
Even if the Court were to address the issue, to amend the priorities of the case would be to ignore the previous order of the case, in violation of the law of the case.
D. The Other Issues Raised by the Claimants do notProvide Them With Recovery
On page 13 of their post-hearing memorandum, D'Angelo and Larsen suggest that receivership for a limited liability company is not allowed under statute. They recognize on the same page that the receivership is proceeding in equity. If they are suggesting that the Court is without jurisdiction to consider an equitable receivership, they should have done so when notified of the temporary receivership and at the hearing for the appointment of a permanent receiver. They did not object when the receiver was appointed or when the priorities were established by the Court.
As D'Angelo and Larsen did not address their potential remedies under the theories of equitable estoppel, unjust enrichment, or mechanics' lien statutes, the Court will not discuss those remedies at length. However, the mechanics' lien law does appear to provide a remedy to creditors performing work on buildings to the extent of the value *Page 13 
of the goods and services supplied. R.I.G.L. ch. 34-28. As specific statutory remedies are available, equitable remedies available to D'Angelo and Larsen may be precluded.
 V. Conclusion
For the reasons stated, the motions of D'Angelo Custom Homes, LLC and D. Larsen and Sons LLC to subordinate the debt of the Wells Fargo Bank, N.A. debt is denied.
[1] Rather than producing copies of conventional bills issued and checks received, D'Angelo produced its bank account statements to track the date of the payments, and an AIA Application for Payment form to show its billing.
[2] The evidence is insufficient, even using a preponderance of evidence standard, for the Court to conclude when the conversations in this paragraph occurred.
[3] Of course, it would be difficult to remember the date of a specific telephone call some thirty months later, unless some record was made.
[4] Further, when Mr. D'Angelo discussed his November calls to Mr. Lingle, he makes no reference to any discussion concerning an agreement which the two gentlemen previously reached. (Tr. at 49-50.)
[5] Of course, the fact finder must question Mr. D'Angelo's credibility when he admitted under oath that he received payments, which he did not. (Exhibit 7.)
[6] Regardless of their relative size, these were substantial accounts receivable for both D'Angelo and Larsen. It would have been wise for D'Angelo to memorialize the key conversation, (the alleged conversation with Mr. Lingle), in writing, particularly when he realized that WREC's mortgagee-lender was taking an aggressive attitude toward controlling its financing of the WREC debt. *Page 1