In re ATLANTICRANCHER, INC., Debtor.

John Aquino, Chapter 7 Trustee, Plaintiff,

v.

Emilia F. Black, Stanley D. Black, and J & C Electronics, Inc., Defendants.

Bankruptcy No. 99–12942–JNF. Adversary No. 00–1161.

United States Bankruptcy Court, D. Massachusetts.

June 21, 2002.

Charles A. Dale, III, Gadsby Hannah LLP, Boston, MA, for John Aquino, Chapter 7 Trustee.

H. Bissell Carey, III, Robinson & Cole, LLP, Boston, MA, for Defendants.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matters before the Court are Counts II, III, V, and VI of the nine count

Complaint filed by John Aquino, the Chapter 7 Trustee of AtlanticRancher, Inc. ("AtlanticRancher" or the "Debtor") against Emilia F. Black, Stanley D. Black, and J.C. Electronics, Inc. d/b/a/ J & C Logistics ("J & C"). The issues presented include whether loans to the Debtor made by Emilia F. Black and Stanley D. Black (collectively "the Blacks") should be re-characterized as equity interests in the Debtor corporation and whether the Blacks's claims should be equitably subordinated to all other secured and unsecured claims pursuant to 11 U.S.C. § 510(c). In his Complaint, the Trustee, alternatively, seeks a determination, pursuant to 11 U.S.C. § 506(c), of the extent to which he may surcharge the Blacks's collateral, if any, for the reasonable and necessary costs and expenses of preserving or disposing of property. That matter, however, was not tried and is not now before the Court.

The Court conducted a trial on October 10, 2001, October 24, 2001 and December 14, 2001. At the trial, five witnesses testified and approximately one hundred thirty-eight exhibits were introduced in evidence.[1] The Court now makes its findings of facts and conclusions of law pursuant to Fed. R. Bankr.P. 7052.

## II. PROCEDURAL HISTORY

On April 7, 1999, the Debtor filed a voluntary Chapter 11 petition. On April 27, 1999, it filed its Schedules and Statement of Financial Affairs. Prior to that date, the Debtor had filed an Emergency Motion for Leave to Use Cash Collateral and for Approval of Cash Collateral Stipulation with the Blacks, and another creditor, J & C, had filed a Motion for Order Converting Case to Chapter 7. In its Emergency Motion, the Debtor, a retail seller of specialty clothing primarily through catalog sales, disclosed that it had inventory of finished clothes to which it ascribed a retail value of $2,870,000 and a cost basis of $1,025,000. It also disclosed that the Blacks had secured claims in the total principal sum of $425,000 plus interest and that almost its entire inventory was in the possession of J & C, its catalog fulfillment agent and the holder of a warehouseman's lien in the sum of $234,000. In its motion, J & C averred that the Debtor was suffering a negative cash flow and that there was "a complete absence of any reasonable likelihood of rehabilitation."

In its Schedules, the Debtor listed personal property, including inventory and a net operating loss carryforward to which it ascribed a value of $4,465,519.28. It also listed secured claims totaling $467,000 and unsecured claims totaling $1,863,244.61. On its Statement of Financial Affairs, in response to question 19(b) requiring a debtor to list "all officers and directors of the corporation, and each stockholder who directly or indirectly owns, controls, or holds 5 percent or more of the voting securities of the corporation," the Debtor listed the following: Engle E. Saez, President, Treasurer, Clerk and Director (Common, 7% fully diluted, 16.47% undiluted); Robert Kahn, Director (Preferred B and warrants (less than 3% total interest undiluted)); James O'Hare, Director (Preferred A, Preferred B and warrants (about 1% total interest undiluted)); TJJ Corporation (Preferred B & E, 15.16%); David Klibanoff (Preferred B, 5.23%); Jane B. Jackson (Preferred A & B, 10.45%); Adam Young (Preferred B & E, 5.43%); and Stanley E. Black [sic] (Preferred E, 8.71%).

On June 4, 1999, the Debtor filed an Amended Motion for Leave to Conduct a

---

1. The agreed exhibits accepted in evidence include duplicates.

Public Auction of All Assets by Sealed Bidding Procedure. On June 29, 1999, the Court heard the Amended Motion, as well as both the Debtor's Motion for Leave to Use Cash Collateral and J & C's Motion for Order Converting Case. The Court denied the Debtor's Motion for Leave to Conduct a Public Auction and granted J & C's Motion, thus mooting the cash collateral motion. The United States Trustee filed a Certificate of Appointment and Acceptance on behalf of John Aquino on July 1, 1999.

On March 24, 2000, the Trustee filed an adversary complaint against the Blacks and J & C. The Trustee formulated nine counts in his Complaint as follows: Count I: Declaratory Judgment Under 28 U.S.C. § 2201 (J & C); Count II: Recharacterization of Debt to Equity and Equitable Subordination (Emilia F. Black); Count III: Recharacterization of Debt to Equity and Equitable Subordination (Stanley D. Black); Count IV: Determination of Secured Claims Under 11 U.S.C. § 506 (J & C); Count V: Determination of Secured Claims Under 11 U.S.C. § 506 (Emilia F. Black); Count VI: Determination of Secured Claims Under 11 U.S.C. § 506 (Stanley D. Black); Count VII: Determination of Surcharges Under 11 U.S.C. § 506(c) (J & C); Count VIII: Determination of Surcharges Under 11 U.S.C. § 506(c) (Emilia F. Black); Count IX: Determination of Surcharges Under 11 U.S.C. § 506(c) (Stanley D. Black). On September 6, 2000, this Court stayed the adversary proceeding as to J & C pending resolution of the Trustee's claims against the Blacks. Therefore, Counts I, IV, and VII of the Trustee's Complaint are not before the Court at this time. Moreover, the Trustee submitted evidence only as to

Counts II and III and did not directly address Counts V and VI, although the evidence is sufficient for the Court to rule on those counts.

## III. FACTS

### A. *The History of the Debtor*

Engle Saez ("Saez") founded AtlanticRancher, Inc. on June 30, 1995. (Joint Pretrial Stipulation at ¶ 5). AtlanticRancher was a retail seller of high quality, casual, functional clothing, mostly through catalog sales, although it also sold through its website and a retail location in Marblehead, Massachusetts. (Joint Pretrial Stipulation at ¶ 4). According to its founder, Saez, "[t]he objective was to build a sizable and scalable lifestyle brand operating in the men's and women's apparel and accessories category, to be distributed through a number of channels." (Saez, Dep. 1 at 8). Saez hoped to ultimately take the company public, stating "the play . . . was always to build value in the brand and it required substantial investment upfront." (*Id.* at 8–9).

Saez, David Mumma ("Mumma"), Joseph Gallinaro ("Gallinaro") and Lamberto Cecchi were among the initial investors in the Debtor corporation. (*Id.* at 9).[2] These four individuals constituted the initial Board of Directors (the "Board"). (*Id.* at 11–12). Saez was president and chief executive officer, and Douglas Redding ("Redding") was the chief financial officer. (*Id.* at 12).

Saez stated that Mumma was his first investor, indicating the following:

I think he initially invested $25,000 with a promise to invest another $25,000. I had two other investors who came on line in I think September or in the fall of

---

**2.** Pursuant to an agreement of the parties and this Court's order of May 24, 2001, the deposition testimony of Saez in both the form of a

transcript and a videotape was introduced in evidence to obviate the need for him to appear at the trial.

1995, each with $50,000. So the Mumma investment together with the Joseph Galinaro [sic] investment and the Cecchi investment totaled $150,000.

(*Id.* at 9). Some of the initial investment monies were used to produce some prototype catalogs and to fund Saez's expenses while he promoted the business plan and solicited funding.

By the fall of 1996, AtlanticRancher had mailed approximately 200,000 catalogs to potential customers whose names were "rented" from other catalogs. (*Id.* at 11). Although the catalog received a favorable response, indeed, "[i]t was seen as a great initial success,"the company was not yet self-sufficient from catalog sales and was cash strapped. (*Id.* at 12–13). Saez was attempting to raise money from "high net worth private investors," including friends and family.[3]

By mid–1997, the company had little to no capital left to finance its second catalog. Because additional money was needed in order to keep operating, Saez continued to seek out additional investors and privately sold shares of stock for $2 per share. (*Id.* at 18–19).

In June of 1997, prior to the issuance of its first catalog, AtlanticRancher's total assets were approximately $369,000; its liabilities were approximately $640,000. (*Id.* at 17). For the period between June 30, 1997 and November 10, 1997, AtlanticRancher projected receipts of approximately $752,000 and total disbursements of approximately $1,744,000. (*Id.* at 16; Ex. 10). Saez sought to raise an additional $1,000,000 to cover the projected deficit and help fund the expenses associated with the fall catalog. (Saez, Dep. 1 at 18). Saez testified that it was necessary to send the catalog to the printers in early July,

1997 and that unless additional funding was received to pay the printers, AtlanticRancher would have to cease operations. (*Id.* at 19–20).

B. *The Note and Warrant Subscription Agreement and Related Documents*

In the spring of 1997, George Neble, an accountant at Arthur Andersen who served as the accountant for AtlanticRancher, introduced Stanley D. Black ("Black") to Saez as a potential investor. (Saez Dep. 1 at 14; Black, Trial Transcript 1 at 50; Ex. 14). Black had extensive experience in the catalog and retail industry and had formed TrendLines, Inc., which had become a publicly traded company that operated chains of retail tool shops and retail golfing equipment sales centers. (Black, Trial Transcript 1 at 49–50). Saez testified that Black initially sought to be an equity investor and represented that he could invest "up to a million dollars." (Saez Dep. 1 at 18). He added that he was eager for Black's participation because he would be a "value added investor,"contributing expertise and acumen in addition to money. (*Id.* at 18–19).

Saez testified that, in furtherance of the Blacks's investment in AtlanticRancher, he provided Black with numerous documents and information, including the June 30, 1997 balance sheet which showed that the Debtor's liabilities were almost twice as much as the value of its total assets. (*Id.* at 16–17; Ex. 11). According to Saez, within days of the deadline by which the company needed to obtain funds to print its catalogs, Black, who did not want to be a lead investor, decided against becoming an equity investor, electing instead to extend a 45–day loan to AtlanticRancher. (*Id.* at 19–20). Because the Debtor needed

---

**3.** One friend of Saez's family invested approximately $500,000 "in various rounds at [$]100,000 at a time...." (Saez, Dep. 1 at 13).

at least $300,000 for, among other things, printing its fall catalog to "get ... to the next wave," Saez testified that it "really had no choice" but to accept Black's terms. (*Id.*).

On July 3, 1997, the AtlanticRancher Board held a special meeting. Saez, Rosario Suarez, Gallinaro, Lamberto Cecchi and Mumma attended the meeting. (Ex. 14).[4] In addition to the company's five directors, Redding, Lanfranco Cecchi, and two attorneys, Thomas Durkin, Esq. and Jennifer Eilers, Esq. of Lucash, Gesmer & Updegrove, LLP, corporate counsel to AtlanticRancher, attended the meeting at the invitation of the Board. (*Id.*). At the meeting, Saez informed the Board about his conversations with Black. He told the Board that Black was a "principal of a publicly traded mail order business that is expanding into retail." (*Id.*). When some of the directors raised concerns about "the proposed $300,000 *investment*" and the Debtor's ability to repay the 45–day note when it matured, Saez, according to the minutes of the July 3, 1997 meeting, "acknowledged the possibility of such a default, but noted that the Company would continue to seek out further financing during the term of the note." (*Id.*)(emphasis supplied). In addition, "Saez acknowledged the risks related to this transaction, but explained that further negotiation of the terms with Mr. Black to favor the Company ... [was] ... not likely to be successful." (*Id.*). He indicated that Black had made it clear that he would not advance monies to the company unless his

terms were accepted. Ultimately, the Board unanimously approved the proposal due to the lack of alternative financing. (*Id.*).

Saez testified that he accepted Black's terms because "[i]t was either accept the terms as difficult as they were, accept it as dilutive as they were to all the other shareholders, accept those or do something else, delay the catalog, go out of business, those kind of things." (Saez Dep. 1 at 20). He stated that he knew that if he did not accept the deal that they [the directors] would have to "close the company and everybody [would] lose[ ] what they already invested." (*Id.* at 28). With respect to the risk of nonpayment of the 45–day Convertible Promissory Note, discussed below, Saez testified that the company thought that it would be able to raise enough money to retire the debt or that he would be able to appeal to Black's goodwill and "kind of work out something after demonstrating that we could stay on track and actually launch the catalog." (*Id.* at 26).

On July 9, 1997, the Debtor executed numerous documents that had been drafted by the Blacks's attorneys, including a 45–day Convertible Promissory Note in the sum of $300,000 with an interest rate of 10% per annum, a Note and Warrant Subscription Agreement, a Common Stock Purchase Warrant granting Emilia Black the right to purchase 600,000 shares of common stock between July 9, 1997 and July 9, 2007, a Stockholders Agreement, a Registration Rights Agreement, an all as-

---

4. Richard Van Pelt ("Van Pelt") was not a member of AtlanticRancher's Board in July of 1997 (Ex. 14), although he served as an advisor to Saez. He was a candidate for the Board in mid-September of 1997 (Ex. 21), and eventually served on the Board until he resigned in the latter part of 1998. Van Pelt, a former chairman of Jordan Marsh, a now defunct department store chain, and a consultant in the retail industry, testified that he opposed the Black transaction because of the restrictive covenants contained in the loan documents, viewing them as an abrogation of directors' responsibilities. Nevertheless, he recognized that the Black loan "was the only form of cash available at the time...." (Van Pelt, Trial Transcript 1 at 15–16).

set Security Agreement, UCC–1 Financing Statements for filing with the Secretary of State for the Commonwealth of Massachusetts, the Marblehead Town Clerk and the Maryland Secretary of State,[5] and a Trademark Security Agreement. (Ex. 15 (1–17)). Emilia Black was identified as the lender on all relevant documents executed by the Debtor on July 3, 1997 (Joint Pretrial Stipulation at ¶ 12), but she never participated in the Debtor's affairs, and Stanley Black advance the $300,000 on July 9, 1997.

The Debtor's obligations under the Convertible Promissory Note were personally guaranteed by Saez. Saez also pledged his common stock in AtlanticRancher, which then totaled 630,000 shares, to secure his personal guaranty. (Ex. 15(4), (5); Joint Pretrial Stipulation at ¶ 11).

Pursuant to the Note and Warrant Subscription Agreement, Emilia Black obtained a warrant to purchase 600,000 shares of AtlanticRancher stock (upon default the number of shares increased), in addition to the shares that she could acquire upon conversion of the Promissory Note, at a purchase price of $.50 per share prior to any default and at a price of $.20 per share upon default. (Ex. 15(2); Joint Pretrial Stipulation at ¶ 12). Apart from the $300,000 advanced on July 9, 1997, the Blacks did not provide the Debtor with any additional consideration for the Warrant. Emilia Black also obtained the "right to designate one observer at each meeting of AtlanticRancher's Board of Directors and to appoint one director to serve on the Company's Board." (Ex. 15(6); Joint Pretrial Stipulation at ¶ 14). Robert Kahn eventually represented the Blacks on the Debtor's Board, although Board meetings were scheduled when Black could attend. (Ex. 24). Emilia Black also received certain "preemptive rights" under the loan documents which prevented AtlanticRancher from issuing "additional shares of preferred or common stock without first providing her with the opportunity to buy them." (Joint Pretrial Stipulation at ¶ 14; Trial Ex. 15(3) at ¶ 6).

The Note and Warrant Subscription Agreement specifically provided Emilia Black with the right to approve each of the following actions by the Debtor:

(i) Any proposal to incur, assume or guarantee any debt for borrowed money . . .;

(ii) Any proposal to issue any capital stock of the Company(except as to any "Options" as defined in the Warrant), or issue any securities convertible into shares of capital stock of the Company, or, to issue any options, warrants or other rights to purchase or participate in any such stock or other securities of the Company or otherwise after the capitalization of the Company;

(iii) Any proposal to make any expenditure not previously identified in an approved budget, or the entering into any contract or commitment involving aggregate payments in excess of $5,000;

(iv) Any proposal for making any public announcement relating to or identifying the Subscriber [Emilia Black] or any of her affiliates, except if required by law;

(v) Any proposal for the merger of sale of the Company or the sale of all or substantially all its assets;

(vi) Any proposal to amend the charter or by-laws of the Company;

(vii) Any proposal for the redemption or purchase of any outstanding securities of the Company;

---

**5.** Financing statements were recorded with the Secretary of State for the Commonwealth of Massachusetts on July 15, 1997 and with the Marblehead Town Clerk on July 16, 1997. (Joint Pretrial Stipulation at ¶ 10).

(viii) Declaration or payment of any dividends, whether in cash, stock or other property;

(ix) Payment of compensation to Engle Saez in an aggregate amount in excess of $115,000;

(x) Use of proceeds of any insurance received by the Company after the Subscriber invests in the Company;

(xi) Any proposal involving employment or a commercial relationship with or any payment to any relative of an executive or a shareholder of the Company ... or to an affiliate of any shareholder of the Company;

(xii) Any amendment to the Exclusive Supply Agreement with British Millerain Company, LTD. dated April 14, 1996;

(xiii) The appointment of committees of the board of directors or officers of the Company and any proposals relating to the compensation of officers or key agents or employees of the Company;

(xiv) Any proposal to permit the Company or its subsidiaries or affiliates to conduct any type of business other than currently authorized or provided for in the current business plan or offering memorandum of the Company;

(xv) Any changes in financial reporting or accounting principles of the Company; it is agreed that the Company's financial statements will be prepared in accordance with GAAP.

(xvi) Any change in the independent auditors of the Company;

(xvii) Approval of the Company's annual operating and capital budgets;

(xviii) Any proposal or action to cause or permit any subsidiary or affiliate of the Company to take or be affected by the action of the nature described in (i) through (xvii) above.

(Ex. 15(1)). The Note and Warrant Subscription Agreement provided that AtlanticRancher, so long as Emilia Black held the Warrant or any share of Common Stock, would furnish her with annual budgets, annual financial statements, quarterly financial statements and other reports. Additionally, AtlanticRancher agreed to deliver to Emilia Black, on or before August 8, 1997 a legal opinion addressing the corporation's representations and warranties set forth in ¶ 3(a)–(g) of the Note and Warrant Subscription Agreement and that failure to deliver the opinion would constitute and event of default. (*Id.*). In executing the Note and Warrant Subscription Agreement, Emilia Black, in turn, represented the following:

**THE SUBSCRIBER UNDERSTANDS THAT THE COMPANY IS IN THE START–UP PHASE AND HAS A NEGATIVE NET WORTH. THE SUBSCRIBER FURTHER UNDERSTANDS THAT HIS/HER PURCHASE OF THE SECURITIES IS ONE OF VERY HIGH RISK. THE SUBSCRIBER IS ABLE TO BEAR THE TOTAL LOSS OF HIS/HER INVESTMENT IN THE COMPANY.**

(*Id.*).

Black testified that he did not personally negotiate the terms contained in the various documents executed by the Debtor on July 9, 1997, but instead his attorney conducted the negotiations. He added that the "forty-five days and some warrants" were actually suggested by Saez. (Black, Trial Transcript 2 at 17).

As indicated above, Saez and the other Board members were concerned about the extensive rights granted to Black in the Note and Warrant Subscription Agreement and the other documents and the restrictions that they placed on the Company. Indeed, AtlanticRancher's former counsel, Thomas Durkin, Esq. ("Durkin")

of the firm Lucash, Gesmer & Updegrove, LLP, advised Saez and the Board against consummating the transaction with Emilia Black. (Saez, Dep. 1 at 25, 28). On July 9, 1997, Durkin sent a letter to AtlanticRancher in which he stated the following:

We have previously discussed with you in various conversations, including at meetings of the Board of Directors of the company, our significant concerns about the terms and conditions of the Agreement and related documents, and *the significant risk that the transaction could result in the loss of control of the company*. After significant discussions, you and other members of the Board have acknowledged that you understand the risks involved but have decided that in your collective judgment it was in the best interests of the company and yourselves to proceed with the transaction.

(Ex. 13)(emphasis supplied). Durkin concluded his letter by observing that "we [his firm] are very concerned that the structure and terms of the financing, including the opinion requirement, will enable the Blacks *to take control of the company at a bargain price*." (*Id.*) (emphasis supplied). He also expressed concern over the substantial legal fees owed to his firm by AtlanticRancher, indicating that it might be necessary for AtlanticRancher to retain other counsel to update the corporation's records and prepare the required opinion letter, assuming that the firm could indeed produce the opinion. (*Id.*).

Within a few months of this letter, AtlanticRancher had solicited the services of David A. Garbus, Esq. ("Garbus") of Robinson & Cole, which had represented Emilia and Stanley Black in conjunction with the July 9, 1997 transaction. (Ex. 20). On September 5, 1997, Garbus sent a letter to both AtlanticRancher and the Blacks with respect to the contemplated retention of his firm by the Debtor, disclosing the po-

tential conflicts and seeking waivers of those potential conflicts of interest. Apparently satisfied with the responses from the Blacks and the Debtor, on September 8, 1997, he submitted an engagement letter to AtlanticRancher. (Ex. 7). Around this time, Redding left the company. He was eventually replaced by Dale Robinson ("Robinson").

Black testified that he believed that the Convertible Promissory Note would be repaid within 45 days, stating that he took Saez's statements "at face value." (Black, Trial Transcript 1 at 52). He admitted, however, that he received the cash flow forecast covering the period through the end of August of 1997 which made no provision for repayment of the Note. (*Id.* at 57). Indeed, Black also testified that he regularly received financial information about the Debtor's financial health. (*Id.* at 55). Although the Note and Warrant Subscription Agreement, the Convertible Promissory Note, and other documents executed on July 9, 1997 were fully integrated, he stated that he "regarded the warrants as a long term investment" and that he "regarded the loan as the loan." (*Id.* at 58). Black also indicated that he had discussions with Saez as the due date for repayment of the note approached and that Saez told him that the financial condition of the company would not allow it to repay Black and, in fact, the company needed more money. (*Id.* at 58). Thus, Black testified that he did not formally demand repayment of the loan. He stated "[I][t]old him [Saez] that I would not enforce ... [or] ... call the loan." (*Id.* at 58). Saez, however, stated he did not remember having a conversation with Black about repayment of the Convertible Promissory Note and, instead, "[t]he default came and went as a non-event." (Saez, Dep. 1 at 36). The Debtor never repaid the loan or paid interest on the loan. At the time Emilia Black filed a proof of claim in

the Debtor's bankruptcy case, she claimed outstanding interest, calculated at the default rate of prime plus 2% (i.e., 10%), in the sum of $60,465.02. (Ex. 6).

The proceeds from the July 9, 1997 loan, coupled with investment money from other small investors and additional advances by Black, were used to finance the Harvest 1997, Winter 1997 and Holiday 1997 catalogs. (Joint Pretrial Stipulation at ¶ 17). Black, on August 27, 1997, only three days after the Convertible Promissory Note became due, agreed to lend the Debtor up to $300,000 pursuant to a "Grid Note" and other documentation. The balance due under the "Grid Note" was fully repaid in November of 1997. (*Id.* at ¶ 16). On November 10, 1997, Black also loaned the Debtor an additional $155,887. As of November 22, 1997, the Debtor had "paid that down to $93,823." (Ex. 25). That loan was subsequently repaid in full, and it was not made part of Black's proof of claim. (Ex. 5).

Both Saez and Black testified in detail about Black's involvement in the financial affairs of AtlanticRancher. Black testified that he did not exercise all of the rights granted to Emilia Black under the Note and Warrant Subscription Agreement. (Black, Trial Transcript 2 at 22–23). Specifically, he stated that he never exercised the right to approve or disapprove payments over $5,000 because "[i]t was almost impossible to do that" and "I didn't have enough knowledge to do it." (*Id.* at 23). Black, however, regularly received cash flow forecasts outlining proposed payments, and, more importantly, regularly discussed financial matters with Saez and Robinson.

Black indicated that he disagreed with Saez over the treatment of accounts payable and the strategy for attracting investors. Specifically, with respect to the payment of vendors, he stated:

Engle thought you always had to put up a good front, that you had the money to pay, and if you didn't have the money it was because the goods arrived late, or whatever, and I believed that you should share your growing pains with the vendor, and if you owed a sweater vendor $20,000, pay him $5,000 and tell him you'd get back to him in a couple weeks, and communicate when you would be able to pay more, because that's what I have successfully done, and I don't think I ever did convince Engle of the wisdom of that.

(*Id.* at 21).

Black also disagreed with Saez on what type of equity investors to approach. Saez favored institutional investors; Black favored individual investors because Saez "had a very compelling story to tell of his boyhood on the Delaware River and discovering the waterproof fabric, and it really had a lot of appeal to individual investors." (*Id.* at 23–24). Saez rejected Black's advice with respect to payments to vendors and "preferred to go after the big home run of finding somebody to invest several million dollars" rather than working with individual investors. (*Id.* at 24).

Saez testified that "[o]ne of the things that Stan really wanted us to stay on top of was the cashflow." (Saez, Dep. 1 at 31). He stated that Black attended all of the Board meetings, either in person or telephonically, except one. (*Id.* at 49). Indeed, the December 13, 1997 Board meeting was held at Black's office, although he was neither a Board member nor a shareholder at the time. (*Id.* at 48). Black also received previews of Board updates, before the official Board meeting, which may or may not have been sent to actual Board members. (Black, Trial Transcript 2 at 58). Black testified that Saez routinely kept him updated on efforts to raise additional money and that he and Saez "did try

to meet once a week, and we did speak often as investment opportunities arose." (*Id.* at 55).

At the time Black loaned the company $300,000, it had 19 holders of common or Preferred A stock and one holder of a convertible note, the Taiwan Investment Group, with respect to 90,000 shares. The largest shareholders were Saez (630,000), Jane B. Jackson (150,000), Gallinaro Buying Service (90,000), Lanificio Cecchi Lido (90,000), and the Taiwan Investment Group (75,000). (Ex. 82).

Van Pelt also testified about Black's involvement with AtlanticRancher.[6] He described Black's participation in the operation of the business as follows: "[i]n many respects he was an equal partner to Engle Saez in that almost everything that was done on a daily basis I believe he and Engle talked about." (Van Pelt, Trial Transcript 1 at 16). He testified that to the best of his recollection that the Norm Thompson deal did not materialize because of the restrictive covenants, although he could not specifically identify which covenants were deal breakers. (*Id.* at 17). He also testified that Kingmaker did not make an investment because of the restrictive covenants. (*Id.*). In 1998, Van Pelt resigned from the Board, stating he did so because

> I was totally frustrated with the way in which the company was being operated and the restrictions on the board. I've been on many boards, and I take my responsibility, fiduciary responsibility, quite serious. I had many conversations with Engle Saez about that and felt that the Board was basically ineffective because no matter what we proposed, ultimately had to be run back through Stan Black—Stan Black, basically, and I just

felt that that was a position that I didn't want to continue in.

(*Id.* at 17–18).

On December 8, 1997, at about the time that Norm Thomson, a privately held catalog company that owns and operates the Early Winters and Solutions catalogs, expressed interest in investing in AtlanticRancher (Ex. 26; Joint Pretrial Stipulation at 18), Saez sent a memo to Black indicating that AtlanticRancher was in a position to repay the $300,000 the Convertible Promissory Note. (Ex. 27). In the letter he stated:

> Stan, as we look forward to closing this round of financing and the prospect of adding to our impressive collection of intellectual capital, we need, as you know to disclose the use of proceeds of this round and also the various shareholder restrictions presently in place. As to the use of proceeds, with the amount of capital coming in the Company will be in a position to repay your original $300,000 note. This will certainly be in the best interests of the Company (it will reduce our debt structure and save interest expense), will be in my best interests (because of my personal guarantees), and more importantly, is in your best interests given the original scenario under which the loan was made.

(*Id.*). Saez asked Black if he would prefer a straight repayment or a conversion into equity shares, (*id.*; Black, Trial Transcript 2 at 26), and raised the possibility of the release of the numerous provisions in the Note and Warrant Subscription Agreement. He stated that since the restrictions were put in place to protect Black's cash investment, repayment of the Note made the restrictions unnecessary. (Ex. 27). In his memorandum, Saez added:

---

6. *See,* note 4 *supra.*

[T]hese restrictions will undoubtedly be barriers to the new investors, particularly Pat Connolly, John Emrick and David Dyer,[7] as they perform their due diligence. I firmly believe that the "new money" will require the removal of these restrictions as a condition of their investments. Moreover, members of the board of directors have advised me that any substantial investor group would require a major revision to the restrictions.

(*Id.*)

Saez also indicated that if AtlanticRancher had tendered payment to Black, it would have forced him to convert, thereby becoming a shareholder with 1.5 million shares or a 47% ownership interest in the company. (Saez, Deposition Transcript 2 at 177 and 192). Saez added that "I just didn't want to create a situation where . . . we . . . would really alienate Stan." (*Id.* at 177). In short, Saez wanted to avoid a battle for control of the company. (*Id.* at 178). Accordingly, he was perpetually balancing the needs of the company and Black's wishes. (*Id.* at 179).

Black testified that while he did not want to convert he never refused repayment of the Convertible Promissory Note. (Black, Trial Transcript 2 at 26). Specifically, Black stated, "I think there were a couple of times when Engle [Saez]—I don't know if it was just a threat to get me to convert—but offered to pay when I basically said 'Can the company afford to do that?'" (*Id.*). In addition, Black stated that several times AtlanticRancher "[t]hreatened to pay me if I wouldn't convert." (*Id.* at 60).

### C. The Norm Thompson Offer to Purchase the Debtor

In December 1997, Norm Thompson, described by Black as a "Cadillac company on the west coast," approached AtlanticRancher about a possible investment in the company. On January 29, 1998, Emrick wrote to Saez stating that Norm Thomson was "very excited about the possibility of working with you" and that his company was "eager to work out a partnering arrangement," adding that Norm Thomson had given Black an offer to transfer his debt and to acquire his outstanding stocks and warrants. (Exs. 38, 122).[8] After describing the advantages of an agreement between the two companies, Emrick concluded "[i]f we are able to conclude our purchase with Stan Black, we would plan to sit down immediately with you and work together to enter into an agreement to accomplish these benefits." (Ex. 38).

Black refused Norm Thomson's *cash* offer in the sum of $1,345,000, although it would have more than quadrupled the return on the Blacks's initial $300,000 advance. (Black, Trial Transcript 1at 62–63). Black testified that he refused the offer because he though the "value would be significantly higher later" and that he

---

7. At least at the time of Saez's communication, Pat Connolly was an executive with Willam Sonoma and John Emrick was the Chairman of Norm Thompson. Additionally, Connolly sat on the Board of Norm Thompson. David Dyer was the ex-president of the Home Shopping Network and was a chief merchant at Land's End with considerable other retail experience and connections with very large and successful companies. (Ex. 26).

8. To sweeten the offer, Norm Thompson, on February 13, 1998, in a letter to Black, offered to purchase the shares, totaling 290,000 of TJJ Corporation, Robert Kahn and several other individuals whom Black introduced to the Debtor, for $1.25 per share and $.25 per warrant. (Ex. 123).

"love[d] the concept and love[d] the company." (*Id.* at 63).

In a memorandum to the Board dated March 5, 1998, Saez explained the circumstances surrounding the Norm Thomson offer. He stated that Norm Thomson withdrew its initial offer to make a $500,000 investment in the current equity round because

> [a]fter looking closer at the capitalization structure, they [Norm Thomson] felt that Stan Black's position was too extensive and that it did not leave enough room for them (or they felt any value-added investor) to participate. In their words, they didn't feel it was fair or equitable for them to make a sizeable cash investment and have to provide financing the operational support that the company needs to only have a 10% or so stake in the company.

(Ex. 41).

In February of 1998, after negotiations with Black had reached an impasse, Norm Thompson issued a "Letter of Intent" directly to AtlanticRancher proposing a $2,000,000 equity investment and a working capital line of credit up to $3,000,000 in exchange for a 40% equity investment in the company, which offer the Debtor rejected. (Joint Pretrial Stipulation at ¶ 19). In the interim, Black, in partnership with Morton Ruderman and Arthur Epstein, both current shareholders of the company, agreed to lend AtlanticRancher $400,000 on the essentially the same terms as the August 28, 1997 loan. (Ex. 46). In a memorandum to the Board dated March 20, 1998, Saez explained that this loan would be automatically repaid through an assignment of catalog cash receipts, adding "[a]s cash comes in to AtlanticRancher from catalog shipments, the funds are wired directly to Stan's account." (*Id.*). He also stated:

This is cumbersome in that we have minimal cash available (only store and wholesale receipts) to operate the business without making written requests for additional funding from Stan to cover time sensitive items such as payroll, customer refund checks and sales tax payments. This is a perpetual and cumbersome process that creates a significant distraction for management and ultimately causes delayed vendor payments which, at our state of development, results in late deliveries of merchandise, delayed catalog drops, etc.

(*Id.*). Saez also observed that he and Robinson had been unable to convince Black to change any of the terms of the original loan and relax the restrictions. Moreover, he revealed that Black did not want to become the banker for the company, although he was a potential majority shareholder, and that "management's focus on the business is severely compromised by the lack of long-term financing." (*Id.*).

On April 6, 1998, Norm Thompson made a second offer to AtlanticRancher in which it proposed "to purchase 500,000 shares of Atlantic Rancher [sic] Series B Preferred Stock from the current offering at $1.00 per share." (Ex. 60). It also proposed, among other things, that when the Debtor's existing fulfillment agreement expired AtlanticRancher and Norm Thompson would identify the basic terms upon which a future fulfillment agreement would be negotiated, that AtlanticRancher would issue Norm Thompson a warrant to purchase up to the number of shares that would result in Norm Thompson owning on a fully diluted basis 25% of the outstanding common stock of the Debtor, subject to certain assumptions and conditions, and that Norm Thompson would be afforded a seat on the Debtor's five-member Board. (*Id.*). The warrant exercise price was to be $1.00 per share, and the warrant was to be exercisable for the same term as

the one granted to Black, but in no event less than three years. Moreover, absent a fulfillment agreement, one-half of the warrant would lapse. (*Id.*).

On April 9, 1998, Saez responded to Norm Thompson's offer, commenting upon the company's need for financing and assistance from Norm Thompson in obtaining "a revolving debt instrument," and observing that the April 6, 1998 proposal was "quite different" from the original proposal and was likely to "run into some controversy." (Ex. 64). On April 10, 1998, Emrick clarified Norm Thompson's offer with respect to the warrants.[9]

Before formally submitting the new offer to the Board, Saez sought comments from Black on how he should present the proposal to the Board. On April 15, 1998, AtlanticRancher's Board met to discuss Norm Thompson's most recent investment proposal. (Joint Pretrial Stipulation at ¶ 21). Black was present at the Board meeting. (Ex. 66). The Board voted on the second proposal and rejected it. (*Id.*). At the meeting, the Board formulated a counter-proposal which included, among other provisions, the issuance of a warrant to purchase at $1.50 per share the number of shares necessary to bring Norm Thompson's total fully diluted ownership to 25%. (Ex. 66). The warrants were to expire in 12 months, rather than three years, and would be contingent upon the Debtor and Norm Thompson coming to an agreement on an acceptable fulfillment agreement. (*Id.*). Moreover, the Board proposed a 60–day advance notice requirement for the exercise of the warrants. (*Id.*). If there

was no fulfillment agreement, the number of shares subject to the warrants would decrease by 50% and the exercise price would increase to $2.00 but the expiration date would not change. (*Id.*). Additionally, the Board agreed to permit Norm Thompson, in its discretion, to purchase one million shares at $1.00 per share, although it would only guaranty it a board seat when Norm Thompson acquired a 25% ownership interest in the company. (*Id.*).

Saez and Robinson immediately began to draft the counter-proposal to transmit to Norm Thompson. Several drafts of a letter were sent to Black who suggested changing the notice period for the exercise of the warrants from 60 to 90 days and adding a requirement that the exercise of the warrant be approved by the boards of both companies. (Exs. 70, 71). Saez sent the counter-proposal to Emrick on April 17, 1998. Shortly thereafter, Norm Thompson rejected the Debtor's counteroffer. According to Robinson, its Board of Directors could not "live with the 12 mos. (really 9) expiration date." (Ex. 72).

Black testified ·that he did not speak against the Norm Thompson offer because, based upon his recollection, he "didn't have to. David Mumma was adamant and very vocal that he could come up with a better offer himself." (Black, Trial Transcript 1 at 68). Black also testified that he did not recall making any changes to the counter-proposal, although he did receive the information regarding the counter-offer before it was made. (*Id.* at 68–69). Relenting, he indicated that he may have taken a

---

9. Specifically, Norm Thompson proposed that AtlanticRancher would issue it a warrant to purchase for $1.00 per share up to the number of share that would result in ownership on a fully diluted basis of 25% of the outstanding common stock of AtlanticRancher. If Norm Thomson and the Debtor did not enter into a fulfillment agreement before the

expiration of the existing agreement "then (a) the Norm Thompson warrant will lapse as to one-half of the covered shares and (b) the exercise price under the Norm Thompson Warrant will thereafter be $2.00 per share . . . [and] . . .[t]he Norm Thompson Warrant will be exercisable for three years from the date of issue." (Trial Ex. 65).

position on the number of shares in the counter-proposal. (*Id.* at 71). He also indicated that he suggested that the Board should change the proposed warrant exercise notice period from 60 to 90 days (*Id.* at 72), although he also stated "I'm sure I might have had something to say, but I don't specifically recall what." (Black, Trial Transcript 2 at 39).

### D. *Kingmaker's Offer*

On May 4, 1998, less than two weeks after Norm Thomson rejected the Debtor's counter-proposal, David Mumma resigned from AtlanticRancher's Board. (Ex. 76; Joint Pretrial Stipulation at ¶ 24). Saez testified that the Board held "some kind of meeting to accept his resignation." (Saez, Dep. 1 at 75). Black recalled that Mumma resigned in order to avoid any appearance of a conflict in order to make an offer on behalf of Kingmaker (USA), Inc. ("Kingmaker"). (Black, Trial Transcript 1 at 75).

Mumma, on behalf of Kingmaker, immediately began soliciting financial and other information from AtlanticRancher, including information about Black's position and arrangements with the company. Robinson forwarded copies of the requests to Black. (Exs. 77, 79). Additionally, in a facsimile transmission to Black from Robinson dated June 24, 1998, Robinson sent Black the company's weekly check run. Robinson noted that AtlanticRancher was starting to fall behind in paying some of its vendors, a situation, he noted, that the Mumma investment would correct. (Ex. 89). Five days later, Saez sent Black a memorandum advising him that Mumma would be visiting the company on June 30, 1998. (Ex. 90). He also solicited from Black leads for a senior finance person as Robinson intended to leave the company. (*Id.*).

On June 30, 1998, Kingmaker extended an offer to AtlanticRancher. The term sheet contained the following:

Investor to make a $1,000,000 initial investment, plus possible additional investment of up to $1,500,000 upon exercise of Warrants (defined below). Further, Investor to provide a revolving loan facility of up to $1,000,000 ("Loan Facility").

\*     \*     \*     \*     \*     \*

Initial investment for (i) 800,000 shares of new series of Preferred Stock (such series is hereinafter referred to as "Shares") at $.50 per share, and (ii) 600,000 Shares at $1.00 per share; plus 3 year warrants ("Warrants") to purchase up to 2,971,563 Shares (or Common Stock, at Investor's option), at $.50 per share. [The foregoing investment (assuming full exercise and conversion into common stock of all warrants, options and other rights of current holders) to represent on the Closing Date not less than 40% of all equity of Company, on fully diluted basis].

(Ex. 93). Kingmaker included certain conditions precedent in its offer:

(a) *Black Conversion/Equity Restructuring.* All debt and/or warrants held by Stanley or Emilia Black (the "Blacks") must be fully converted to equity or repaid as follows: (i) the Amended and Restated $400,000 Grid Note to Stanley Black must be repaid in full and all rights in and to the warrant dated March 19, 1998 to Stanley Black must be extinguished without exercise (with the agreement of all parties who may be participating with Stanley Black therein); (ii) The $300,000 convertible Promissory Note dated July 9, 1997, to Emilia Black must be converted into equity as provided for therein; and (iii) the warrants to purchase 600,000 [sic] shares of Common Stock at $.20 per share must be exercised in full. A plan acceptable to Investor (which shall include the con-

version of all deferred compensation owed to Engle Saez) must be adopted to provide Engle Saez with not less than 12% of the Common Stock....

(b) *Termination of Black Restrictions.* All restrictions on the Company contained in the Black Loan Documentation shall be terminated except for certain restrictions on public announcements.

(*Id.*). In mid-July, 1998, Saez sent a memorandum to the Board in which he described the offer as "substantially below the counter offer that we made to Norm Thompson...." (Ex. 128). He added that "in an effort to speed things along, on July 8, we countered to Kingmaker with an offer that closely resembles the counter we made to Norm Thompson." (*Id.*).

Approximately one month later, on August 7, 1998, Saez communicated with Black about the company's financing options, indicating that "it is critical that we get at least $200,000 in here next week in order to preserve our ongoing business." (Ex. 95). He also indicated that he had conveyed all of Black's objections to AtlanticRancher's corporate counsel, stating "Stan, what I need at this point is your buy-in and support on a counter offer so that I have something to go back to Kingmaker with next week." (*Id.*).[10] Ever the optimist, Saez, on August 10, 1998 and August 21, 1998, communicated with Mumma about the Kingmaker offer in attempt to come to terms.

Saez conducted a telephonic Board meeting on August 25, 1998. (Saez, Dep. 1 at 81; Ex. 98). Saez testified that all Board members except one voted in favor of the Kingmaker Term Sheet. (Saez, Dep. 1 at 82). Saez testified that Black did not participate in the Board meeting because he did not support the deal. (*Id.*).

On August 27, 1998, Mumma, on behalf of Kingmaker, sent Saez a letter indicating "I have just concluded a conversation with Stan where I understand that he does not accept the critical elements contained in the August 25, 1998 [revised] Term Sheet, and conditions precedent which are essential to us cannot be met [sic]. I am very sorry that we could not reach an agreement at this time." (Ex. 99). According to Black, the deal never happened because "we couldn't get together on the question of my converting my debt to equity." (Black, Trial Transcript 1 at 81).

### E. The "Stanley Black Note"

Because the company was unable to secure sufficient outside financing, on or around October 2, 1998, an investor group that included Black, TJJ Corporation and others prepared a term sheet in which they proposed to make a $1,000,000 investment, plus a possible additional investment of up to $2,934,407 upon the exercise of warrants. (Ex. 102). The term sheet became the subject of negotiation. Saez expressed his views about the proposal in a memorandum to Black in which he criticized the length of the exercise periods for three sets of warrants, noting the following:

each ... [are] ... six months longer than the one, two and three year warrants that were proposed in the Kingmaker deal. You'll recall how strongly you felt about keeping the length of warrants to 1 year when we were negotiating with Norm Thompson and Kingmaker. The board (and I) still feel this way, for the same reasons that you articulated, which is that the Company will need cash sooner rather than later and

10. Saez had previously advised Black on July 28, 1998 that "[w]e have arrived at a crisis point with a number of key vendors to whom

we are significantly past due on payments." (Ex. 129).

the longer those warrants are outstanding, the harder it is to raise new capital. (Ex. 107).[11] The evidence was unclear as to whether Black's investor group and the Debtor reached an agreement and whether the investor group actually invested monies in the company. (Exs. 108, 111).

Prior to the date of the term sheet, AtlanticRancher, on September 1, 1998, executed a Demand Note in favor of Black and four associates (TJJ Corporation, Adam Young, and two individuals identified as Cohen and Spokowski) in the principal sum of $600,000 (the "Stanley Black Note") and a Second Amendment to Security Agreement in order to remain in business. (Black, Trial Transcript 1 at 74; Joint Pretrial Stipulation at ¶ 26; Exs. 5, 107). Black personally contributed $225,000 of the total $600,000. (Joint Pretrial Stipulation at ¶ 26). The Stanley Black Note, intended as a short-term bridge note until the Debtor could obtain other financing, was secured by a second lien against all of AtlanticRancher's assets. (*Id.* at ¶ 28). Pursuant to its terms, the principal and interest under the Stanley Black Note were due on demand, and, if not sooner demanded, on December 31, 1998. (*Id.* at ¶ 27).

### F. *The Gordon Brothers Loan*

Less than two months later, on October 28, 1998, AtlanticRancher, through Black's connections (Black, Trial Transcript 2 at 27), was able to secure $300,000 in financing from Enhanced Retail Financing, an affiliate of Gordon Brothers ("Gordon Brothers"). (Joint Pretrial Stipulation at ¶ 29). The Debtor borrowed $300,000 in anticipation of a pledge to loan an additional $1,000,000 by Gordon Brothers. Saez, however, noted in a memorandum to Black dated October 5, 1998, that "GB has expressed to me that theirs is indeed an expensive loan and that we should use the loan as back pocket leverage to go out and get more attractive equity financing." (Ex. 103).

Conditions to the financing were that $475,000 of the $600,000 loaned to the Debtor pursuant to the "Stanley Black Note" had to be converted to shares of common stock in AtlanticRancher (Joint Pretrial Stipulation at ¶ 29) and the July 9, 1997 advance of $300,000 be subordinated. (Ex. 104). Of the $475,000 which was converted to equity, Black only converted $100,000 of the $225,000 that he personally funded, thus becoming an official shareholder in the company in late October of 1998; the remaining $125,000 owed to him remained on the AtlanticRancher books as debt. (Ex. 106; Joint Pretrial Stipulation at ¶ 29). Black testified that he willingly converted a portion of his obligation, because he thought "it was the only way to get the deal done with Gordon [sic], and I thought it would help the company, and it would also be an inducement" to the four other individuals to convert their portion. (Black, Trial Transcript 2 at 28). It would appear that Black and other small lenders converted other monies to equity which they had lent for bridge financing or under

---

11. In his memorandum to Black, Saez also criticized the investors's failure to require the conversion of the $300,000 Convertible Promissory Note dated July 9, 1997, stating "[y]ou'll recall that this is the same argument you used with me regarding the accrual of my deferred compensation. . . . I am not sure how I will be able to describe to the board why the Kingmaker term should not carryover, given that the two deals are supposed to match." (Ex. 107). Finally, he expressed irritation that Black had instructed Garbus of Robinson & Cole to bill AtlanticRancher for the legal fees incurred by the investor group, stating "you guys need to pay your own expenses, as again, this wasn't a term in the Kingmaker deal, or of the bridge financing." (*Id.*).

the March 19, 1998 Grid Note, presumably receiving Preferred E stock (Ex. 106).

The Debtor repaid Gordon Brothers $300,000 loan plus interest on January 8, 1999 in advance of the maturity date of the loan, which was January 31, 1999. (Ex. 136). Upon repayment of the $300,000 loan, the Debtor hoped to secure an additional $1,000,000 in financing from Enhanced Retail Funding. In a memorandum to the Board dated January 11, 1999, Saez stated the following:

> I need to point out that one of the Gordon Brothers conditions for making the $1,000,000 loan is that paying Stan back his $125,000 'will not have an adverse effect on the Borrower's (AtlantiRancher) financial condition or operations or its ability to carry out its business in the ordinary course.' If we pay Stan before we secure the Gordon Brothers loan, we will definitely be short of cash to continue operations.

(*Id.*). Indeed, because the Debtor was behind the curve with respect to its catalog mailings for the Christmas season, it came out of the selling season well below its plan. According to Saez, the company "still had a lot of inventory ... [and] ... no prospects for financing." (Saez, Deposition 1 at 90).

In early March of 1998, Gordon Brothers advised the Debtor that Enhanced Retail Funding would not consider the pledged $1,000,000 loan unless the company raised at least $2,500,000 in new equity, expressing concern about the status of the trade debt and litigation threatened by the company's vendors. (Ex. 137). The Debtor's problems were compounded because, at about the time it applied to Enhanced Retail Funding for the $1,000,000 in financing, the catalog industry environment was volatile as some industry leaders, including J. Peterman and Willis and Geiger, had filed bankruptcy petitions. (Ex. 139).

At this point, the Debtor's financial situation, which had steadily worsened since the Norm Thompson's rejection of its counter-proposal, was dire. It had failed to obtain another loan from Gordon Brothers and "[p]rolonged warm weather patterns throughout the country and broad economic uncertainty throughout the Fall selling season" contributed to revenue shortfalls, preventing the company from obtaining inventory and mailing its catalogs on a timely basis. (Ex. 139). Saez urged approval of the engagement of an investment banker, David N. Deutsch & Co., to help identify and secure equity financing. (Exs. 138, 139). Although willing to act on an emergency basis on the condition that it obtain a second priority security interest, Black refused to sign any "inter-creditor subordination and security agreements." (Ex. 138). Obviously stung by Black's refusal, Saez advised him that the Debtor's general counsel and others would be seeking to equitably subordinate Black's debt, which "would relegate your entire investment to the status of equity and put over $1.6 million in debt ahead of you." (*Id.*). Black, however, testified that he did not recall any such warning. Referring to the Trustee's Complaint against him, he testified that he thought that his loans were secured and safe, adding "I didn't know about all this." (Black, Trial Transcript 1 at 76).

Unable to raise additional monies through equity investment, to obtain financing, or to pay its vendors, the Debtor retained bankruptcy counsel. On April 7, 1999, it filed a voluntary Chapter 11 petition.

### G. *Testimony of Keith Lowey, CPA*

At trial, the Trustee introduced the expert testimony of Keith Lowey ("Lowey"),

a CPA, with experience in analyzing financial transactions. He expressed the opinion that the Blacks's loans should be recharacterized as equity.

In reaching his conclusion that the Debtor's obligations to the Blacks should be recharacterized as equity, Lowey reviewed numerous loan documents and financial records. He testified that, in his opinion, the only way the Debtor could have repaid the Convertible Promissory Note in a timely fashion was through another borrowing. (Lowey, Trial Transcript 1 at 100). Additionally, he maintained that the Debtor was undercapitalized throughout its entire existence, an opinion consistent with the testimony of both Black and Saez. (*Id.* at 104; Saez, Dep. 1 at 51; Black, Trial Transcript 1 at 88). He further testified that the Blacks "weren't conducting themselves as lenders, but in fact were conducting themselves as owners or shareholders." (Lowey, Trial Transcript 1 at 101).

With respect to the Stanley Black Note, Lowey testified that, in his opinion, the obligation should also be recharacterized as equity. In reaching his conclusion, he relied upon two circumstances: 1) although Black and others extended the $600,000 loan, only Black chose not to convert all of the Debtor's obligation to him to equity and retained $125,000 as debt (*Id.*); and 2) the promisees on the $600,000 Note were willing to subordinate their interest to Gordon Brothers, even though their lien had priority (*Id.*), a position inconsistent with that of a true lender. (*Id.* at 101–02). On cross-examination, however, he recognized that the subordination was done in anticipation of a larger loan from Gordon Brothers up to $1 million. (*Id.* at 141).

Lowey also considered it very significant that the Debtor failed to make any payments on either obligation and that, at least with respect to the Convertible Promissory Note, Black did not take any formal steps to demand payment. (*Id.* at 102). With respect to the rights and restrictions imposed by the Note and Warrant Subscription Agreement and other loan documents executed by the Debtor on July 9, 1997, Lowey testified that while some of the controls would not be unusual in view of the exigent financial circumstances of the Debtor in the summer of 1997, the amalgamation of controls was "unusual." (*Id.* at 117–18). He did state, however, that it would not be uncommon for a lender to ask for such restrictions. (*Id.* at 118).

## IV. POSITIONS OF THE PARTIES

### A. *The Trustee*

First, the Trustee asserts that the debts owed to the Blacks should be recharacterized as equity, arguing that "although couched as secured debt" the advances represented by the Convertible Promissory Note and the Stanley Black Note are more properly characterized as equity investments of capital. (Trustee's Pretrial Memorandum at 16). The Trustee contends that Black's investment was denominated as debt, but that the facts compel "the conclusion that the advances evidenced by the Emilia Note [the Convertible Promissory Note] and Stanley Note were equity rather than debt." (*Id.* at 17). In support of his argument, the Trustee points to the following facts: 1) the Debtor was always grossly undercapitalized; 2) Black never attempted to collect the Convertible Promissory Note or exercise any rights under the security agreements; 3) Black bargained for and was given extraordinary rights to control the Debtor's actions under the documents executed on July 9, 1997, which, in essence, were tantamount to a sale of the company; and 4) Black used these controls to prevent the Debtor "from securing meaningful and

badly needed investments from third parties, investments which would have generated more than adequate funds to retire any legitimate debt owed to the Blacks." (*Id.* at 18). The Trustee also asserts that Black urged Saez to solicit individual investors because they would not have the bargaining power and leverage to object to Black's position or the restrictive covenants contained in the Note and Warrant Subscription Agreement. Therefore, according to the Trustee, the debt should be recharacterized as equity.

The Trustee asserts, in the alternative, that if the advances are characterized as debt and not equity the debts should be equitably subordinated to the claims of other creditors under § 510(c) of the Bankruptcy Code because the Convertible Promissory Note and associated loan documents were "akin to a sale of AtlanticRancher" and that Black "effectively owned and actually controlled AtlanticRancher." (*Id.* at 22–23). In support of this argument, the Trustee emphasizes that the Debtor had no expectation that it would be able to timely repay the Convertible Promissory Note, and "[n]o efforts were made to collect this 'loan.' " (*Id.* at 22).

With respect to the Stanley Black Note, the Trustee maintains that when Black personally advanced $225,000 (his portion of the total $600,000 loan) in September, 1998, the Debtor "was more desperate than ever for new capital" (*Id.* at 21–22), although in October of 1998, Black voluntarily converted a portion of this debt to equity and willingly subordinated both the Convertible Promissory Note and the Stanley Black Note to Gordon Brothers. (*Id.* at 22).

The Trustee also relies on Black's rejection of Norm Thompson's cash offer of $1,345,000 less than six months after his initial investment. (*Id.* at 22–23). According to the Trustee, with the exception of his actions in conjunction with the Gordon Brothers financing, Black refused to make necessary concessions, thereby preventing the Debtor from gaining a necessary capital infusion from third parties. (*Id.* at 23). Thus, the Trustee urges the Court to equitably subordinate the Convertible Promissory Note and the Stanley Black Note.

### B. *The Blacks*

The Blacks assert that their actions were consistent with those of a lender, and, therefore, recharacterization is improper. In support of their argument, the Blacks point out that each loan was fully documented, with fixed maturity dates and interest rates, and were secured by the Debtor's assets. (Blacks's Amended Trial Memorandum at 19–20). In addition, they assert that 1) other outside funding was available and obtained; 2) neither loan was subordinated to the claims of all other creditors, except Gordon Brothers; 3) the Trustee's expert, Keith Lowey, CPA, agreed that the actions of the Blacks were not unreasonable or unusual; and 4) the loans were used to meet operating expenses and were not used to purchase capital assets. (*Id.* at 20). They also argue that while Black declined Norm Thompson's offer, he did so because he viewed the warrant as a long term investment and the underlying debt as a loan. (*Id.*). Therefore, the Blacks maintain that the debts should not be recharacterized as equity.

The Blacks also assert that equitable subordination is improper in this case for a number of reasons. First, citing *In re Giorgio*, 862 F.2d 933, 939 (1st Cir.1988), the Blacks argue that they were not "insiders" when the Convertible Promissory Note was executed by the Debtor and that the Court cannot find that their conduct was "egregious and severely unfair in rela-

tion to other creditors" for purposes of equitably subordinating the debt. The Blacks also assert that there is no evidence that the transaction displaced or otherwise prejudiced any other creditor or that Black's actions were inequitable to any other creditors. (*Id.* at 14–17). In addition, the Blacks maintain that there is no evidence that Black exercised his rights to control the Debtor and that the Debtor often rejected Black's advice. (*Id.* at 15). In addition, they maintain that Black did not prevent the Debtor from securing other investments. While Black may have refused to comply with Kingmaker's precondition that he convert the Convertible Promissory Note to equity, they assert that this refusal alone is not inequitable conduct. (*Id.* at 18). They also contend that Black did not prevent the Debtor from obtaining outside financing and, in fact, helped the Debtor secure financing from Gordon Brothers. They emphasize that Black even agreed to convert a portion of the Stanley Black Note and subordinate all remaining loans to the position of Enhanced Retail Funding in order to secure that financing. As a whole, the Blacks argue that their actions do not support the claim that the debts should be equitably subordinated to the claims of unsecured creditors.

## V. DISCUSSION

### A. *Recharacterization: Applicable Law*

In *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726 (6th Cir.2001), the United States Court of Appeals for the Sixth Circuit, in holding that a bankruptcy court may recharacterize debt as equity, recognized a split of authority with respect to the power of the bankruptcy court to recharacterize debt as equity. *Compare In re Pacific Express, Inc.*, 69 B.R. 112, 115 (9th Cir. BAP 1986) (no specific provision of the Bankruptcy Code that allows courts to recharacterize claims); [12] *In re Pinetree Partners, Ltd.*, 87 B.R. 481, 491 (Bankr.N.D.Ohio 1988) (same) *with In re Herby's Foods*, 2 F.3d 128, 133 (5th Cir.1993)(bankruptcy court is authorized to recharacterize a loan as equity contribution even in the absence of grounds for equitable subordination); *Fett v. Moore (In re Fett Roofing & Sheet Metal Co., Inc.)*, 438 F.Supp. 726, 729–30 (E.D.Va.1977) ("a bankruptcy court, sitting as a court of equity, will disregard the outward appearances of the transaction and determine its actual character and effect"); *Herzog v. Leighton Holdings, Ltd. (In re Kids Creek Partners)*, 212 B.R. 898, 931 (Bankr.N.D.Ill.1997)(recognizing separate cause of action from equitable subordination); *In re Cold Harbor Assocs.*, 204 B.R. 904, 915 (Bankr.E.D.Va.1997) (court "is not required to accept the label of 'debt' or 'equity' placed by the debtor upon a particular transaction, but must inquire into the actual nature of a transaction to determine how best to characterize it."); *Blasbalg v. Tarro (In re Hyperion Enterprises)*, 158 B.R. 555, 561 (D.R.I.1993)(articulating 10 factors for evaluating recharacterization); *Diasonics Inc. v. Ingalls*, 121 B.R. 626, 631 (Bankr.N.D.Fla.1990)(articulating Eleventh Circuit Standard set forth in *N & D Properties, Inc.*, 799 F.2d 726 (11th Cir.1986), for recharacterization). *See also* James H.M. Sprayregen, Jonathan Friedland, and Marc J. Carmel, "Recharacterization from Debt to Equity: Do Bankruptcy Courts Have the Power?" 5

---

12. The court stated that "[w]here there is a specific provision governing these determinations, it is inconsistent with the Bankruptcy Code to allow such determinations to be made under different standards through the use of a court's equitable powers." 69 B.R. at 115.

Bankr. Strategist 1 (March 2002)(citing *In re Outboard Marine Corp.*, No. 00 B 37405, 2002 WL 571661 (Bankr.N.D.Ill. Jan. 14, 2002)(no basis in bankruptcy law for recharacterization of debt as equity)). According to the Sixth Circuit, "[t]he source of the court's general equitable powers is § 105 of the Code." *Autostyle Plastics,* 269 F.3d at 748.

The court in *Autostyle Plastics* compared recharacterization and equitable subordination as follows:

> The effect of a bankruptcy's [sic] court's recharacterization of a claim from debt to equity may be similar to the court's subordination of a claim through equitable subordination in that, in both cases, the claim is subordinated below that of other creditors. However, there are important differences between a court's analysis of recharacterization and equitable subordination issues. Not only do recharacterization and equitable subordination serve different *functions,* but the *extent to which a claim is subordinated* under each process may be different. These are facts that the *In re Pacific Express* court appeared not to recognize. Recharacterization cases "turn on whether a debt actually exists, not on whether the claim should be equitably subordinated." Matthew Nozemack, Note, *Making Sense Out of Bankruptcy Courts' Recharacterization of Claims: Why Not Use § 501(c) Equitable Subordination?,* 56 Wash. & Lee L.Rev. 689, 716 (1999) (criticizing *Pacific Express*). In a recharacterization analysis, if the court determines that the advance of money is equity and not debt, the claim is recharacterized and the effect is subordination of the clam "as a proprietary interest because the corporation repays capital contributions only after satisfying all other obligations of the corporation." *Id.* at 719. In an equitable subordination analysis, the court is reviewing whether a legitimate creditor engaged in inequitable conduct, in which case the *remedy* is subordination of the creditor's claim "to that of another creditor *only to the extent necessary* to offset injury or damage suffered by the creditor in whose favor the equitable doctrine may be effective." *In re W.T. Grant Co.,* 4 B.R. 53, 74 (Bankr. S.D.N.Y.1980) (emphasis added).

> If a claim is recharacterized and, therefore "the advance is not a claim to begin with" and the creditor is not a legitimate one, "then equitable subordination never comes into play." *In re Georgetown Bldg. Assocs.,* 240 B.R. 124, 137 (Bankr.D.D.C.). Indeed, "where shareholders have substituted debt for adequate risk capital, their claims are appropriately recast as equity regardless of satisfaction of the other requirements of equitable subordination." *In re Hyperion,* 158 B.R. at 561. Some of the confusion between the doctrines is caused by the fact that undercapitalization is a factor in the equitable subordination analysis and often is a factor in a recharacterization analysis, leading "some courts to equitably subordinate claims that other courts would recharacterize as equity contributions." Nozemack, *supra* page 33, at 717 [sic].

> Because both recharacterization and equitable subordination are supported by the Bankruptcy Code and serve different purposes, we join those courts that have concluded that a bankruptcy court has the power to recharacterize a claim from debt to equity. *See, e.g., In re Herby's Foods,* 2 F.3d at 133; *In re Georgetown Bldg.,* 240 B.R. at 137; *In re Cold Harbor,* 204 B.R. at 915; *In re Hyperion,* 158 B.R. at 561; *In re Fett Roofing,* 438 F.Supp. at 729–30.

*Autostyle Plastics,* 269 F.3d at 748–49 (footnotes omitted)(emphasis in original).

Thus, while once considered solely in conjunction with the doctrine of equitable subordination, bankruptcy courts now consider recharacterization a separate cause of action. *See In re Kids Creek Partners*, 212 B.R. 898, 931 (Bankr.N.D.Ill. 1997). *See also In re Hyperion Enterprises*, 158 B.R. 555, 561 (D.R.I.1993)(citing *Diasonics Inc. v. Ingalls*, 121 B.R. 626, 630 (Bankr.N.D.Fla.1990)). As a result, this Court may recharacterize debt as equity "[i]n a case in which a creditor has contributed capital to a debtor in the form of a loan, but the loan has the substance and character of an equity contribution." *Kids Creek*, 212 B.R. at 931.[13]

In *Diasonics*, the bankruptcy court observed that "[d]etermining the equitable subordination issue prior to determining whether the advance is a loan or a capital contribution is similar to taking the cart before the horse." 121 B.R. at 630. It added "[i]f it is determined that the claim is a capital contribution and not a debt then equitable subordination would not have any relevance." *Id.* Noting that tax courts first established standards to assist in elevating the substance over the form of a transaction and that *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), was the first bankruptcy case to enunciate the substance over form standard, it quoted *In re N & D Properties, Inc.*, 799 F.2d 726, 733 (11th Cir.1986), for the proposition that " '[s]hareholder loans may be deemed capital contributions in one of two circumstances: where the trustee proves initial undercapitalization or where the trustee proves that the loans were made when no other disinterested lender would have extended credit.' " *Diasonics*, 121 B.R. at 631 (citing 799 F.2d at 733)(appellee and fellow-shareholder al-

leged to have engaged in "a scheme and device" to avoid the risks of business ownership). *See also Equibank v. Dan–Ver Enterprises, Inc. (In re Dan–Ver Enterprises, Inc.)*, 86 B.R. 443, 448 (Bankr.W.D.Pa.1988)(undercapitalization is only a basis for subordination where the claimant is a director, shareholder, or other insider).

In contrast to the 11 factors enunciated by the court in *Autostyle Plastics*, the district court in *Hyperion* used the factors that the bankruptcy court had set forth in *In re Labelle Indus., Inc.*, 44 B.R. 760 (Bankr.D.R.I.1984), factors that it had culled from a Rhode Island Supreme Court case, *Tanzi v. Fiberglass Swimming Pools, Inc.*, 414 A.2d 484 (R.I.1980). These factors include:

(1) the adequacy of capital contributions;

(2) the ratio of shareholder loans to capital;

(3) the amount or degree of shareholder control;

(4) the availability of similar loans from outside lenders;

(5) certain relevant questions, such as

(a) whether the ultimate financial failure was caused by undercapitalization;

(b) whether the note included payment provisions and a fixed maturity date;

(c) whether a note or other debt document was executed;

(d) whether advances were used to acquire capital assets; and

(e) how the debt was treated in the business records.

---

13. Because the Defendants failed to argue that recharacterization is not a separate cause of action or that it is not available as a sepa-

rate cause of action under Massachusetts law, this Court shall reserve for another day an exegesis on either of those issues.

158 B.R. at 561.[14] These factors must be considered in the aggregate and no one factor is determinative. The district court, in affirming the bankruptcy court, found that the multi-factor approach was in accord with the approach used in the tax court. *Hyperion*, 158 B.R. at 562 (citing *Montclair, Inc. v. Commissioner*, 318 F.2d 38 (5th Cir.1963)). *See also Union Meeting Partners*, 160 B.R. 757, 774 (Bankr. E.D.Pa.1993); and *In re Fett Roofing and Sheet Metal Co., Inc.*, 438 F.Supp. 726, 731 (E.D.Va.1977). The district court in *Hyperion*, however, specifically rejected the notion that undercapitalization alone justifies recharacterization of debt to equity. 158 B.R. at 561.

### B. *Recharacterization Analysis*

#### 1. The July 9, 1998 Transaction

While many of the facts relate to both the Convertible Promissory Note (and the Note and Warrant Subscription Agreement) and the Stanley Black Note, the Court shall first address the facts as they specifically relate to the July 9, 1997 transaction and analyze them in light of the factors outlined in *Diasonics*, 121 B.R. at 631, *N & D Properties*, 799 F.2d at 733, and *Hyperion*, 158 B.R. at 561.

Applying the *N & D Properties* standard first, which the court repeated in *Diasonics*, the Court finds that the Trustee has sustained his burden with respect to undercapitalization and the absence of a disinterested. lender who would have extended credit to AtlanticRancher in the summer of 1997. The testimony that the Debtor was severely undercapitalized for its entire existence was uncontroverted by any witness and emphasized by the Trustee's expert, Lowey. Moreover, in June of 1997, Saez testified that the Debtor's liabilities were almost double the value of its assets and that between June 30, 1997 and November 10, 1997 it had insufficient cash to go forward with its business plan. At the time Black, through his spouse, "loaned" the company $300,000, AtlanticRancher had no options other than accept Black's terms, delay the production of its fall catalog, or cease operations. There were no institutional lenders on the horizon, and Saez had exhausted his reservoir of friends, family and former associates for additional small investments in the company. Although Van Pelt and Durkin cautioned the Debtor against the transaction with Black, warning that it could result in the loss of control of the company and was tantamount to a sale, Saez and the Board of AtlanticRancher had "no choice" but to accede to Black's nonnegotiable terms. Their warnings were prescient, and, if this Court were to rely upon the two *N & D*

---

**14.** Similarly, the court in *Autostyle Plastics* set forth the following factors, which the court in *Roth Steel Tube Co. v. Comm'r of Internal Revenue*, 800 F.2d 625, 630 (6th Cir. 1986), used in a tax court case. These factors are:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances;

> (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.

269 F.3d at 750 (citing *Roth Steel*, 800 F.2d at 630) The court added "[n]o one factor is controlling or decisive" and " '[t]he more [a transaction] appears to reflect the characteristics of . . . an arm's length negotiation, the more likely such a transaction is to be treated as debt.' " *Autostyle Plastics*, 269 F.3d at 750 (quoting *In re Cold Harbor*, 204 B.R. at 915).

*Properties* factors alone, the Trustee would prevail on his recharacterization count.

With respect to the *Hyperion* factors, the first factor, inadequacy of capital contributions, has been satisfied. At the time Debtor executed the documents drafted by Black's counsel, which eventually became its corporate counsel, on July 9, 1997, it had raised approximately $151,200 from the issuance of common stock (270,000 shares issued at $.56 per share) and $875,000 from the issuance of Preferred A stock (437,500 shares at $2.00 per share).

The second *Hyperion* factor is at least superficially inapplicable to the Blacks because neither Stanley nor Emilia Black were shareholders of the Debtor in July of 1997. Moreover, Black never caused Emilia Black to exercise her rights under the Note and Warrant and Subscription Agreement, and he only obtained stock in late October of 1998 when he converted part of his $225,000 loan (which, in turn, was part of the September 1, 1998 $600,000 loan) to equity. In view of the rights to pervasively control the Debtor that Black obtained under the Note and Warrant Subscription Agreement, and, in view of the testimony, however, the Court finds that Black became an insider of the Debtor as that term is defined in 11 U.S.C. § 101(31)(B)(iii)(" 'insider' includes—. . . person in control of the debtor"). Thus, if the second factor is reworded as the ratio of insider loans to capital, the Debtor, in July of 1997, had obtained no loans from anyone other than shareholders or insiders.

With respect to the third factor, the degree of shareholder control, from Black's point of view, he had the best of both worlds. At least in form, he was immunized from a consideration of this factor because he was not a shareholder at the time the $300,000 loan was extended

and did not become one until late in 1998. Nevertheless, the Convertible Promissory Note, which could not have been repaid absent additional borrowing by the Debtor, and the Note and Warrant Subscription Agreement, for which he did not give additional consideration, provided him, as a "lender," with an extraordinary ability to direct the company's affairs, and the Convertible Promissory Note and Warrant guaranteed him an investment opportunity over a ten year period—the so-called "overhang." On paper, at least, he did not bear the risk of ownership, yet he obtained a properly documented note secured by a security interest in all assets of the company *and* all the incidents of an owner, officer and director, without actually owning any stock or serving as an officer or director. Seemingly shielded from the risk of investment and the fiduciary duties associated with being an officer and director of the company, Black could assume control of the company in an "elder statesman" role, providing AtlanticRancher with, in Saez's words, intellectual capital. Indeed, Saez, Redding, and, then, Robinson kept Black abreast of the financial condition of the company, recognizing that if AtlanticRancher forced him to convert he would own approximately 47% of the company.

Black testified that Saez kept him regularly informed about his efforts to raise additional money and that "[w]e did try to meet once a week, and we did speak often as investment opportunities arose." (Black, Trial Transcript 1 at 55). Saez testified that Black attended all of the board meetings, either in person or telephonically, except one, and that Board meetings were scheduled when Black could attend. (Ex. 24). One board meeting was even held at Black's office. In addition, Black received previews of board meeting agendas, previews which may or may not

have been sent to actual Board members. (Black, Trial Transcript 2 at 58). Thus, the Court rejects Black's testimony that he took Saez's statements about repayment of the Convertible Promissory Note in 45–days at "face value," finding it incredible in view of his sophistication as the owner of successful catalog businesses. In short, although Black was not technically an owner of the company, Saez, as a result of the integrated set of loan documents executed on July 9, 1997, was compelled to treat him as if he were a substantial owner of the company rather than simply a lender.

Moreover, Black was extremely involved in the daily operations of the Debtor, although Black and Saez disagreed about certain payment practices and the types of investors the company should approach to raise capital. The Trustee's argument that Black favored individual investors over larger institutional investors because they would lack leverage to force him to relinquish his control over the company is compelling, particularly in view of the company's history. While the Court accepts Black's testimony that Saez had a moving sales pitch appealing to individual investors, Saez undoubtedly was correct in attempting to relieve the company from its chronic, debilitating, and eventually fatal cash shortfalls due to the absence of revolving credit or sufficient working capital by obtaining a sizable investment. As Saez repeatedly emphasized, Black's 10–year overhang precluded those investment opportunities until Gordon Brothers required subordination of the July 9, 1997 loan when it agreed to lend the Debtor $300,000 on October 28, 1998. Moreover, although Black testified that he did not become involved in the daily decision making with respect to payments to vendors, the Court finds that his control over the Debtor was such that Saez tiptoed around him in keeping him informed about company matters, particularly as Black loaned

the Debtor additional monies, repaid directly from the assignment of catalog cash receipts, over the course of the Debtor's operations. As Saez eventually complained, this was a cumbersome process that failed to alleviate, and indeed may have exacerbated, the Debtor's perpetual cash crisis while simultaneously distracting management.

With respect to the fourth *Hyperion* factor, the availability of similar loans from outside lenders, the Debtor never obtained loans from outside lenders until several months before it filed its Chapter 11 petition. When its financial condition was perilous in the fall of 1998, Black utilized his prior relationship with Gordon Brothers to assist the Debtor in obtaining a $300,000 loan from Enhanced Retail Funding, which was to be followed by a $1,000,000 working capital loan. Enhanced Retail Funding required subordination of all but $125,000 of the Blacks's combined debt, a concession that the Blacks would not make until that critical time in the Debtor's history. In the second half of 1997 and throughout most of 1998, the rights granted to Emilia Black under the July 9, 1997 loan documents were so all encompassing, especially because the loan was convertible to shares upon default for a period of 10 years, that the Debtor was "never able to attract a large ... lead investor because of the overhangs." (Saez Dep. 1, p. 24). Recognizing the pitfalls associated with the rights granted to Black in the Note and Warrant Subscription Agreement and the effect of the ten-year overhang, Saez, on December 8, 1997, informed Black that "the members of the board of directors have advised me that any substantial investor group would require a major revision to the restrictions." (Ex. 27). Although Black and several of his associates periodically advanced additional monies to the Debtor that were repaid directly by

the assignment of catalog receipts, the Debtor was never able to obtain loans from outside lenders until Black, using his connections with Gordon Brothers, facilitated the Enhanced Retail Funding loan.

In addition, investment proposals made by Norm Thompson and Kingmaker failed, at least in part, because of Black's refusal of Norm Thompson's cash offer and his refusal to accede to Kingmaker's condition that he exercise his warrant and release the rights restrictions contained in Note and Warrant Subscription Agreement. Although the Debtor's Board rejected the Norm Thompson offer and authorized a counter-proposal, the evidence showed that Black was instrumental in altering the terms of the counter-proposal authorized by the Board. When Norm Thompson rejected the Debtor's counter-proposal, it did so in part, as a result of terms suggested by Black that differed from those authorized by the Board. (Exs. 70, 71).

Undercapitalization was by far the single most important cause of the Debtor's financial failure, although bankruptcies of other catalog companies, warm weather and economic uncertainty constituted other factors. Without cash, Saez testified, "[t]he fulfillment company ... shut us off and they were kind of holding our goods hostage." (Saez, Dep. 1 at 91). Without needed capital and without the ability to obtain a further loan from Enhanced Retail Funding, a third party, and as a result of this situation with the fulfillment company, the Debtor was forced to file bankruptcy.

Turning to the remaining *Hyperion* factors, the evidence was uncontroverted that the Note and Warrant Subscription Agreement and the Convertible Promissory Note were properly documented with maturity dates and interest rates, used for working capital and treated as debt on the Debtor's books. Thus, the Debtor's records show that the $300,000 loan was not an equity investment, although the Debtor did not pay interest on the "loan." Moreover, Saez testified that days before extending the loan, Black decided against pursuing an equity investment, electing to only advance the money in the form of a loan. Additionally, the Debtor's Board specifically approved the July 9, 1997 transaction as a loan, even though at the time AtlanticRancher's projections showed that it would not have funds to repay the Convertible Promissory Note in 45 days.

Despite proper documentation, Black never made any effort to collect the Convertible Promissory Note or foreclose on his collateral. He recognized that if he attempted to exercise his rights as a secured creditor it would have put the company out of business. (Black, Trial Transcript at 61). Thus, Black did not treat the Convertible Promissory Note and the rights contained in it as a loan; rather he treated the $300,000 as an investment. Had he acted as a typical lender, he more than likely would have accepted Norm Thompson's cash offer of $1,345,000 made just six months after the July 9, 1997 transaction. He erroneously believed that the "value would be significantly higher later." (Black, Trial Transcript 1, p. 63).

As the court recognized in *Kids Creek Partners*, "[t]he ultimate issue is ... whether the transaction had the substance and character of an equity contribution or a loan." 212 B.R. at 932. The Court has considered all the factors outlined in *N & D Properties, Diasonics,* and *Hyperion* and, for the reasons stated above, concludes that the transaction had the substance and character of an equity contribution while cast in the form of a loan. Were the Court to hold otherwise, it would elevate form over substance. Therefore, the Court shall enter judgment in favor of the

438

Trustee and against Emilia Black on Count II of the Trustee's Complaint.

### 2. The Stanley Black Note

On September 1, 1998, the Debtor executed a note in favor of Black. Black advanced $225,000 and four associates advanced the balance of the $600,000 total. One month later, an investor group headed by Black prepared a term sheet that purportedly mirrored the Kingmaker deal. The two-page demand note executed on September 1, 1998, though secured by an all asset security agreement, stands in marked contrast to the seven-page Convertible Promissory Note and the nine-page Note and Warrant Subscription Agreement. At this juncture, Black was indeed acting as a lender of last resort and not as an investor. The fluctuating interest rate and timing of the Gordon Brother loan less than two months later militate against a finding that Black intended his $225,000 advance to be an equity contribution instead of a loan. At the time the money was loaned, the Debtor was struggling to obtain additional financing, and the Stanley Black Note was intended to be a short-term bridge loan until the Debtor could secure other financing either from Black's investor group or Gordon Brothers.

Knowing that the Debtor needed a cash infusion to secure additional financing, Black introduced the Debtor to Gordon Brothers. As a result, on October 28, 1998, AtlanticRancher was able to secure $300,000 in financing from Gordon Brothers. In order to secure this financing, Black and his associates agreed to Gordon Brothers's precondition that they convert $475,000 of the $600,00 loan. Black agreed to convert $100,000 of the $225,00 personally funded by him, with the remaining $125,000 owed to him remaining on the Debtor's books as debt. Black decided to convert a portion of his loan to equity,

even though he had no obligation to convert. He testified that he willingly converted because he was trying to induce his associates to do the same so that the Debtor could secure this much needed financing from Gordon Brothers. In short, outside funding was at least potentially available to AtlanticRancher, and Black helped secure it.

Considering all of the other factors used in the analysis of the July 9 1997 transaction, the Court finds the Trustee failed to sustain his burden of proving that the Stanley Black Note should be recharacterized as equity. Accordingly, the Court shall enter judgment in favor of Black and against the Trustee on Count III of the Trustee's Complaint regarding the Recharacterization claim.

### C. Equitable Subordination: Applicable Law

As the bankruptcy court in *Diasonics* recognized, if a claim is determined to be a capital contribution rather than a debt, equitable subordination has no relevance. 121 B.R. at 630. Accordingly, having decided that the $300,000 advanced on July 9, 1997 was a capital contribution, the Court need not consider equitable subordination of that debt. Nevertheless, because the Court has found that Black's $125,000 advance was a loan, not a capital contribution, the Court must consider equitable subordination as an alternative holding.

Section 510(c) of the Bankruptcy Code defines equitable subordination and provides in part:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed

interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). The principles associated with the doctrine of equitable subordination are well developed in the First Circuit. *See, e.g., Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust)*, 968 F.2d 1332, 1353 (1st Cir.1992); *Boyajian v. DeFusco (In re Giorgio)*, 862 F.2d 933 (1st Cir.1988); *In re Clamp–All Corp.*, 233 B.R. 198, 211 (Bankr.D.Mass.1999) *Rodolakis v. Chertoff (In re 1236 Dev. Corp.)*, 188 B.R. 75, 81–83 (Bankr.D.Mass.1995); *Ferrari v. Family Mutual Sav. Bank (In re New Era Packaging, Inc.)*, 186 B.R. 329, 335–36 (Bankr.D.Mass.1995); *In re Beverages International Ltd.*, 50 B.R. 273, 280 (Bankr.D.Mass.1985). *See also Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458 (5th Cir.1991); and *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699–700 (5th Cir.1977). Courts in Massachusetts have adopted the widely-accepted test for equitable subordination articulated by the Fifth Circuit.

In *In re Fabricators, Inc.*, 926 F.2d 1458 (5th Cir.1991), the Fifth Circuit reiterated its three-prong test for equitable subordination first set forth in *Mobile Steel* as follows:

(1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim

must not be inconsistent with the provisions of the Bankruptcy Code.

926 F.2d at 1464–65 (citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir.1977)).[15] The First Circuit has elaborated on the test as follows:

Although the remedy of equitable subordination has been applied relatively infrequently, it is usually directed towards misconduct arising in three situations: when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; when a third party dominates or controls the debtor to the disadvantage of others; or when a third party defrauds the other creditors.

968 F.2d at 1359–60. The First Circuit explained the purpose of the remedy:

The case law does not suggest that the doctrine of equitable subordination gives the bankruptcy court a *general* license to weigh the moral quality of each debt or to compare creditors in terms of moral worth; rather it indicates that the bankruptcy court may equitably subordinate those debts, the creation of which was inequitable *vis-a-vis other creditors*. It permits a bankruptcy court to take account of misconduct of one creditor towards another, just as that court often can take account of a creditor's misconduct towards the *debtor* when considering whether to allow, or to disallow, a claim.

Thus, most cases involving "equitable subordination" also involve corporate insiders or fiduciaries who have obtained unfair advantages over other creditors through, for example, fraud. Where a bankruptcy court has subordinated the debt of a creditor who was not an insid-

---

**15.** Since the enactment of the Bankruptcy Code's equitable subordination provision in 1978, *see* 11 U.S.C. § 510(c), the third element is arguably moot, and the Court need not address it. *See In re Hyperion Enterprises*, 158 B.R. at 559. Therefore, the Trustee need only prove the first two requirements in order to succeed in his claim.

er, it has done so on the ground that that conduct was egregious and severely unfair in relation to other creditors. *Id.* at 1360 (quoting *Giorgio*, 862 F.2d at 939) (emphasis in original). The court also observed that "[c]laims arising from dealings between a debtor and an insider are rigorously scrutinized by the courts. On the other hand, if the claimant is not an insider, 'then evidence of more egregious misconduct such as fraud, spoliation or overreaching is necessary.'" *Id.* (citations omitted).

### D. *Equitable Subordination: Analysis*

██ Because this Court has found that Black was an insider of the Debtor, the Trustee, need not prove egregious misconduct. Nevertheless, Black's actions are subject to rigorous scrutiny, and the Trustee was required to satisfy the *Mobile Steel* test. The Court finds that the Trustee has failed to establish the first two elements of the *Mobile Steel* test.

In July of 1997, the Debtor was essentially a "start-up company." The Blacks's investment of $300,000 permitted the Debtor to print and mail its first catalog, the response to which was exceedingly positive. Saez emphasized that Black made many valuable contributions to the Debtor's business plan because of his experience in catalog sales. Black did provide "intellectual capital." Although Black had substantial direct and indirect control over the Debtor as a result of the rights granted to Emilia Black in the Note and Warrant Subscription Agreement, he did not exercise that control in an unconscionable or inequitable manner. His advice with respect to communicating with vendors and soliciting investments from individuals was well intentioned and responsi-

ble, even if motivated, in part, by self-interest. Black tinkered with the Norm Thompson offer thus preventing the Debtor from receiving the benefits of a partnering agreement with Norm Thompson, including much needed capital, access to bank financing and fulfillment center services, but the other Board members, particularly Mumma, were optimistic about the Debtor's prospects in the spring of 1998. Black can only bear a small part of the responsibility for Norm Thompson's decision.

With respect to the Kingmaker deal, Black refused to accede to its conditions, electing instead to try to put together an investor group to match its offer. While the Debtor's prospects had considerably dimmed at that time, Black did not act unconscionably or inequitably at this time either. Although he repeatedly told Saez that he did not want to be the Debtor's banker, he did continue to advance monies to the Debtor secured not only by security agreements but by the direct assignment of catalog receivables. When the Debtor was in dire need of cash, Black, perhaps motivated to protect his investment, repeatedly stepped up to the plate as a lender until the Debtor could secure more stable financing. He also introduced the Debtor to Gordon Brothers which indicated that it was interested in providing the Debtor $1,000,000 in financing following repayment of its initial $300,000 loan. At that time, Black subordinated the July 9, 1997 note and $100,000 of his $225,000 portion of the September 1, 1998 loan to facilitate the transaction. Again, that conduct was not "conduct which ... [was] ... lawful, yet shock[ing] to one's good conscience." *Beverages International*, 50 B.R. at 281 (citation omitted).[16]

---

**16.** In *Beverages International,* the court stated:

A creditor's unconscionable domination or control to the detriment of other creditors may constitute inequitable conduct. The

With respect to the second element of the *Mobile Steel* test, harm to creditors, the court in *Beverages International* stated the following: "[g]enerally harm would consist of the loss of a right that impacts on the results of the bankruptcy distribution." 50 B.R. at 283, adding "[t]he misconduct may result in harm to the entire creditor body, a particular class of creditors, to a few or just one creditor." *Id.* (citing A. DeNatale & P. Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors,* 40 Business Lawyer No. 2, 429, 426 (1985)).

The Court finds that the Trustee failed to prove harm to creditors between September 1, 1998 when Black and his co-lenders advanced the Debtor $600,000 and late October when Black subordinated all but $125,000. The harm to creditors resulted from Debtor's chronic undercapitalization and inability to raise needed capital, not Black's conduct. Indeed, had Black and the other lenders failed to subordinate $475,000 of the $600,000 loan creditors may have been suffered more harm. While Black's 10–year overhang was unacceptable to Kingmaker and other investors, it existed prior to a substantial run-up of debt. Moreover, creditors were on notice of the Blacks's security interests. Finally, although the Black was paid interest on his post-July 9, 1997 advances, he never profited in any substantial way from his investment in the Debtor. Indeed, with the benefit of hindsight, it can be seen that he sacrificed the opportunity to net approximately $1,000,000 in profit from an acceptance of the Norm Thompson offer. His belief in the company's long term viability blinded him to that opportunity. Similarly, he refused Kingmaker's conditions. Although it cannot be ascertained whether Kingmaker would have been able to assist the Debtor in solving its long-term needs, particularly in view of the other problems identified by Saez, namely a warm winter and market uncertainty, Black was not under any legal obligation to accept its offer, and his refusal to do so cannot be found to be inimical to the interests of trade creditors in view of his subsequent conduct in loaning the Debtor money and introducing the Debtor to Gordon Brothers.

## VI. CONCLUSION

Upon consideration of the foregoing, the Court shall enter judgment in favor of the Trustee and against Emilia F. Black on Counts II and V and shall enter judgment in favor of Stanley D. Black and against the Trustee on Count III and VI.

creditor's relationship to the debtor is important in determining whether his conduct was equitable. Where a creditor has taken control of the debtor, he assumes the fiduciary duties of management and a duty to deal fairly with other creditors. "The creditor's duty of fair dealing is increased in the precise degree that the creditor has power and control over the debtor's affairs." The Court must scrutinize the creditor's actual use of its control over debtor's operations to determine whether its control constituted inequitable conduct.
50 B.R. at 282. The court added: "[m]ore than mere pressure or influence must be shown" and simply "[m]onitoring operations and proferring advice to a debtor, even coupled with a decision to withhold credit, does not rise to the level of control for the purposes of equitable subordination." *Id.* (citations omitted).